JAMES P. HERBERG, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Herberg v. Commissioner
Docket No. 22957-81.
United States Tax Court
T.C. Memo 1987-229; 1987 Tax Ct. Memo LEXIS 225; 53 T.C.M. (CCH) 755; T.C.M. (RIA) 87229; May 4, 1987. James P. Herberg, pro se. David E. Gaston, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in and additions to petitioner's income taxes as follows: Additions to Tax
Year
Deficiency
Section 6653(b) [1]
1977
$241,592.07
$120,796.03
1978
$220,267.05
$110,133.52
*227 The issues are: (1) whether petitioner had unreported taxable income in the amounts determined by respondent, (2) whether distributions to petitioner from certain pension and profit sharing plans qualify for the ten year averaging provided by section 402, and (3) whether any part of any underpayment in petitioner's income tax for 1977 or 1978 is due to fraud within the meaning of section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and the exhibits associated therewith are incorporated herein by reference. Petitioner James P. Herberg resided in Pennsylvania at the time he filed his petition and at all other relevant dates. In 1960, he started to practice medicine in Altoona. His practice was successful and by 1965 his annual gross income was in excess of $100,000. In 1969, petitioner incorporated his medical practice and by 1970, the corporation had added two more doctors and was grossing approximately $500,000 per year. In 1971, the corporation adopted a pension plan and a separate profit sharing plan for petitioner and its other employees. During this financially successful period, 1960 through 1971, petitioner accumulated *228 substantial investments in mutual funds, stocks and life insurance. However, in or about 1971 he began to use drugs and alcohol and his practice began to deteriorate. In 1974, he purchased and moved together with his wife and three children to a 100-acre farm in Centre County. Later that year, petitioner and his wife separated and during 1975 and 1976 he paid his wife $24,000 per year for the support of her and the children. However, these payments were reduced to $10,770 in 1977 and $9,200 in 1978. Petitioner was divorced in 1978. In or about January 1977, petitioner ceased to practice medicine and began to spend most of his time on the farm in an attempt to operate it in a profitable manner with the assistance of David Seamans ("Seamans"). In the previous July, Seamans, a livestock and farming consultant, had orally agreed to provide petitioner with consulting services and to assist him in the purchase and sale of farm animals. In 1977, petitioner, with Seaman's guidance, purchased cattle, horses and pigs for breeding at a total cost of $21,250. The feeding expenses for these animals in 1977 and 1978 were $13,870 and $3,450, respectively. During 1977 and 1978 petitioner *229 also employed one man to assist in the farm operation in exchange for room and board. In addition, petitioner employed a housekeeper during these years in exchange for her room and board. For the last three months of 1978, the housekeeper's baby daughter also lived on the farm at petitioner's expense. During 1977 and 1978 petitioner received funds from the sale or other liquidation of assets acquired by him in prior years. The amount of such funds together with certain other relevant detail is set forth in the following schedule: Cash
Asset
Year of Liquidation
Received
Basis
Stocks
1977
$ 13,958.52
$16,445.74
Stocks
1977
4,176.23
4,782.52
Stocks
1977
628.71
665.28
Pension Plan
1977
[2] 67,643.49
N/A
Profit Sharing
Plan
1977
[3] 103,122.16
N/A
Two Mares
1977
6,000.00
6,000.00
Medical Office [4]
1977
8,700.00
34,692.25
Medical Office
1978
385.00
Stocks
1978
5,000.00
unknown
Stocks
1978
1,680.00
unknown
$211,294.11
$62,585.79
*230 At the end of October 1977, petitioner resumed practicing medicine on a part time basis. However, by this time he was beginning to act irrationally due to his increasing use of drugs and alcohol. Petitioner's irrational behavior led to the termination of Seamans' consulting services and in January 1978, Seamans sold petitioner's cattle and kept $4,739 of the proceeds in exchange for the services he had rendered to petitioner from 1976 through 1977. Petitioner did not receive any of the sale proceeds because the balance was apparently consumed by transportation and other sales expenses paid from the proceeds by Seamans. In July 1978, petitioner met and was soon engaged to Jean Ryan ("Ryan"). She allegedly witnessed some of petitioner's use and sale of drugs and in October 1978, informed the Pennsylvania State Police of such activities. On January 17, February 13, and February 21, 1979, petitioner made sales totaling $7,000 of cocaine and other controlled substances to a State Trooper in Centre County. For an undisclosed sum of money, petitioner also sold cocaine, morphine, biphetamine, quaaludes and preludin on or about November 8, 1978, December 6, 1978, January 10, 1979 and *231 March 29, 1979 in Juniata County. He was subsequently indicted, tried, and convicted in both counties on charges arising out of these sales. On April 14, 1978, the accounting firm of Alpern, Rosenthal & Co., ("Alpern") filed on behalf of petitioner an application for an automatic extension of time to file his income tax return for 1977 to June 15, 1978. The 1977 return reflecting a loss of $2,572.40 was filed on June 12, 1978. On this return he elected to report any lump sum received from a qualified pension or profit sharing plan pursuant to section 402. The return, however, failed to include the distribution he had received from the profit sharing plan during 1977. Subsequently, Alpern prepared for petitioner an amended 1977 income tax return which reflected the increase in petitioner's taxable income by the lump sum received from the plan by petitioner in 1977 but petitioner failed to file the amended return. Petitioner's 1978 income tax return was prepared by Joseph Downey. On it, petitioner reported a net loss of $3,505. In a notice of deficiency mailed to petitioner on June 12, 1981, respondent determined that petitioner had unreported taxable income in 1977 and 1978 *232 of $354,305.93 and $339,790.50, respectively, computed as follows: 1977
1978
Unreported income from
drug trafficking
$340,744.00 $341,491.00 Disallowance of capital
loss carryover
19,056.38 4,804.50 Receipt of agricultural
subsidy
78.00 Personal exemptions
(3,000.00)
(3,000.00)
Taxable income per return
(2,572.45)
(3,505.00)
Unreported taxable income [5]
$354,305.93 $339,790.50 OPINION A. RESPONDENT'S COMPUTATION OF UNREPORTED INCOME
Under section 6001 a taxpayer is required to keep sufficient records to enable respondent to compute the taxpayer's correct tax liability. In the absence of such records respondent is authorized by section 446 to use any method of computation which in his opinion clearly reflects the income of the taxpayer. See Moore v. Commissioner,722 F.2d 193, 195 (5th Cir. 1984); Sutherland v. Commissioner,32 T.C. 862 (1959), affg. a Memorandum Opinion *233 of this Court. However, the method adopted by respondent must be reasonable in light of all the surrounding circumstances. Giddio v. Commissioner,54 T.C. 1530, 1533 (1970); Meneguzzo v. Commissioner,43 T.C. 824 (1965); Schroeder v. Commissioner,40 T.C. 30, 33 (1963). If warranted by the circumstance the method adopted by respondent can be adjusted. Meneguzzo v. Commissioner,43 T.C. 824, 831 (1965). In this case respondent used with certain adjustments the cash expenditures method of computing petitioner's income. See Appendix A. This well-recognized method was described in Taglianetti v. United States,398 F.2d 558, 562-563 (1st Cir. 1968), affd. per curiam 394 U.S. 316 (1969) as follows: The net worth method involves the ascertaining of a taxpayer's net worth positions at the beginning and end of a tax period, and deriving that part of any increase not attributable to reported income. This method, while effective against taxpayers who channel their income into investment or durable property, is unavailing against the taxpayer who consumes his self-determined tax free dollars *234 during the year and winds up no wealthier than before. The cash expenditure method is devised to reach such a taxpayer by establishing the amount of his purchases of goods and services which are not attributable to the resources at hand at the beginning of the year or to non-taxable receipts during the year. The beginning and ending net worth positions must be identified with sufficient particularity to rule out or account for the use of a taxpayer's capital to pay for his purchases. If the end-of-year net worth position is equal to that at the beginning of the year, and if there are no non-taxable sources of income during the year, such as gifts or inheritances, the totality of the year's expenditures reflects total taxable income. If ending net worth shows an increase, the increase reflects an added component of income. If ending net worth shows a diminution, the decrease reduces pro tanto the extent to which expenditures reflect income. [Fn. refs. omitted.] Petitioner does not argue that respondent's use of the cash expenditures method is erroneous. He contends, however, that: (1) some of the cash expenditures used by respondent were never made, (2) some of the cash expenditures *235 or accumulations were made from nontaxable receipts, and (3) he is entitled to certain deductions which were not allowed by respondent. We will consider each of his contentions in the order listed. (1) Cash Expenditures and Accumulations.
(a) Budget and Child Support. As reflected in Appendix A, respondent determined and included under this heading, that petitioner expended $25,202 in 1977 and $27,420 in 1978 for the support of himself and a farm hand, the housekeeper, and the housekeeper's daughter who lived with him on the farm. Petitioner stipulated that he spent $18,144 in 1977 and $18,791 in 1978 for his personal food, car, taxes, mortgage payments and charitable contributions. For the reasons set forth below we agree with petitioner that the difference between the stipulated amounts and the amounts used by respondent should be deleted from respondent's computation. First, respondent arrived at the expenditures determined by him by reference to statistics compiled by the Bureau of Labor Statistics (BLS) for the average amount expended during 1977 and 1978 for the support of a family of four. The use of such statistics in this instance is improper, however, because *236 the support of a family of four includes a number of items such as educational expenses, entertainment and travel which are obviously not present here since petitioner only provided the farm hand, the housekeeper and her daughter with room and board. Furthermore, such room and board was provided by petitioner in exchange for the services of the farm hand and the housekeeper and, at least part of the cost of such services (the part rendered by the farm hand), would be deductible in view of our conclusion hereinafter with respect to petitioner's farming activities. Secondly, even if the use of the BLS statistics were proper, an adjustment would be necessary because respondent used the estimated cost for supporting a family residing in an urban area rather than the less expensive rural area where petitioner's farm was located. Thirdly, the housekeeper's baby was only present on the farm during the last three months of 1978 while respondent's calculations include the BLS figures for four persons for a full year in both 1977 and 1978. In view of the foregoing we conclude that respondent's use of the unadjusted statistics provided by BLS is improper in this case and that personal expenditures *237 made by petitioner during 1977 and 1978 did not exceed the stipulated sums of $18,144 and $18,791. (b) Sums Expended for Personal Drugs. Respondent determined that petitioner expended $3,500 per week during 1977 and 1978 to support his drug habit. Petitioner contends that this figure is grossly excessive. From the record as a whole it is apparent that respondent's determination is based solely upon the testimony of Jean Ryan that at some date in 1978 petitioner told her that he was expending that amount per week to support his drug habit. We are satisfied that respondent's reliance upon this statement is misplaced because, first and most importantly, Ryan's conduct and demeanor at trial forces us to conclude that she was not a credible witness and that her testimony is totally unreliable. Furthermore, Ryan did not meet petitioner until July 1978 and knew nothing of his drug usage prior to that time; and while admitting that she was petitioner's constant companion during the last half of 1978, she was unable to recall more than six occasions when she observed petitioner using drugs. Finally, while also admitting that she had no actual knowledge of the cost of drugs to the average *238 addict she was able to recall that petitioner as a doctor could purchase drugs at their retail or even wholesale price rather than at "street value." From the foregoing we conclude that respondent's determination of petitioner's expenditures for personal drugs is excessive. Nevertheless we are convinced that he did spend certain sums during both 1977 and 1978 to support his drug habit; and from the entire record before us and bearing heavily against petitioner, we find that such expenditures amounted to no more than $500 per week. Accordingly, appropriate adjustments will be made to respondent's computation. (c) Expenditures for Farm Expenses. From the record as a whole, we are satisfied that respondent's determination of the amounts spent by petitioner in 1977 and 1978 to operate his farm is correct with one exception. The exception is the amounts paid to Seamans, the farm consultant. Respondent concluded that Seamans was paid $2,732 in 1977 and $275 in 1978. However, at trial Seamans testified that he was not paid anything until 1978, at which time he sold petitioner's cattle and retained from the proceeds $4,739 for the services he had rendered from 1976 to 1978. Accordingly, *239 respondent's determination on this point should be decreased by $2,732 in 1977 and increased by $4,464 ($4,739 less $275) for 1978. (2) Cash Expenditures and Accumulations From Non-taxable Sources. Respondent determined that in addition to the cash expenditures made during 1977 and 1978, petitioner had accumulated $160,000 in cash from his drug trafficking by the end of 1978. In his computation of unreported income respondent placed $80,000 of this amount in each of the years 1977 and 1978. Petitioner contends that no such accumulation occurred. Here again, respondent relies solely upon the testimony of Ryan to arrive at his determination. In a written statement prepared for use in petitioner's trial on the criminal drug charges, Ryan stated that petitioner told her he sometimes carried large sums of cash. However, we are unable to extend any creditability to this statement not only because of the aforementioned untrustworthiness of the witness but also because the statement clearly indicates that the witness doubted the truthfulness of petitioner's comments. Furthermore, the statement contains unexplained alterations as indicated in the margin. [6]
*240 In his computation, respondent recognizes that the petitioner had a total of $44,900 in receipts during 1977 and 1978 from nontaxable sources such as petitioner's beginning bank account balance, loans from his medical practice, and the return of his basis on the sale of real property, stock, automobiles and livestock. Petitioner does not disagree with the total but does point out that all of these receipts occurred in 1977 and argues that they should be recognized in that year instead of one-half in 1977 and one-half in 1978 as determined by respondent. We agree with petitioner. In view of all of the foregoing we find that the cash accumulations determined by respondent in the total amount of $160,000 are incorrect and should be deleted from respondent's computation and that all of the $44,900 in receipts from nontaxable sources should be allowed in 1977 and none in 1978. (3) Additional Deductions. In his computation respondent failed to take into consideration that portion of the lump-sum distributions received by petitioner which represents allowable capital gain deductions under section 1202. Respondent also failed to allow any deduction for farm expenses although he *241 asserts and we have found that petitioner expended considerable sums of money in 1977 and 1978 in the operation of the farm. From the record as a whole, we are convinced and respondent does not seriously contend to the contrary that petitioner's farming activities were entered into for profit. Consequently he is entitled to deduct any ordinary and necessary farm expense incurred during these years, such as the management fees paid to Seamans in 1978 and the feed expenses found by respondent of $13,870 in 1977 and $3,450 in 1978. [7]
B. TEN YEAR AVERAGING
The second issue for decision is whether respondent correctly determined petitioner's tax with respect to the lump-sum distributions received by him in 1977. In this respect we have found that on his 1977 income tax return, petitioner elected to have his lump-sum distributions taxed pursuant to section 402(e). [8]
*242 Respondent does not contend that petitioner is not eligible for the special averaging provided by section 402 for lump-sum distributions. In fact, respondent determined that petitioner is liable for $13,593.66 in additional tax under section 402 since petitioner did not make a qualified rollover of his profit sharing plan's lump-sum distribution. However, if a taxpayer elects to have a lump sum taxed under section 402 that portion of the lump-sum distribution which is taxed as ordinary income shall be allowed as a deduction from gross income. Section 402(e)(3). While we agree with respondent that petitioner is liable for the additional tax under section 402, we note that respondent incorrectly failed to allow the deduction provided by section 402(e)(3) to the extent the lump sums were included in ordinary income. Consequently an appropriate adjustment will be made to respondent's computation. C. ADDITION TO TAX FOR FRAUD
On this issue respondent has the burden of proving by clear and convincing evidence that there was some underpayment of tax in 1977 and 1978 and that some part of the underpayment for each year was due to fraudulent acts of petitioner. Section 7454(a); *243 Rule 142(b). Respondent's burden with respect to fraud is met if it is shown with such evidence that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). The presence of fraud is a question of fact to be determined from the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed but must be established by affirmative evidence. Beaver v. Commissioner,55 T.C. 85 (1970). It may, however, be proved by circumstantial evidence because direct proof of a taxpayer's intent is rarely available and his entire course of conduct may be examined to determine whether the fraudulent intent is present. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); *244 Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Respondent contends that in this case he has carried his burden of proving fraud on the part of petitioner by clear and convincing evidence of the following: First petitioner had unreported income from an illegal source far in excess of the amount reported on his return for 1977 and 1978. Benn v. Commissioner,T.C. Memo. 1966-8, affd. per curiam 394 F.2d 505 (5th Cir. 1968). See also Webb v. Commissioner,supra at 379; and Estate of Brame v. Commissioner,25 T.C. 824, 831 (1956), affd. per curiam 256 F.2d 343 (5th Cir. 1958). Secondly, petitioner dealt in cash during 1977 and 1978 and failed to maintain any record of his income from drug sales. Korecky v. Commissioner,781 F.2d 1566, 1568 (11th Cir. 1986), affg. per curiam T.C. Memo. 1985-63; Cefalu v. Commissioner,276 F.2d 122, 129 (5th Cir. 1960), affg. T.C. Memo. 1958-37. Thirdly, petitioner failed to supply complete information about his income and expenses to his tax return preparer. Korecky v. Commissioner,supra at 1569; *245 Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172. Moreover, petitioner failed to file the amended 1977 income tax return prepared by his accountant in order to reflect the lump-sum distributions received by petitioner. Fourthly, petitioner is a well educated individual who had previously filed proper returns and obviously knew of his obligations with respect to the tax laws. For the reasons set forth above we agree with respondent that he has clearly and convincingly established that the underpayment which exists with respect to 1978 is due to fraudulent acts by petitioner; and consequently, the addition to tax under section 6653(b) was properly asserted in that year by respondent. We, however, are unable to sustain the imposition of the addition to tax under section 6653(b) for 1977 because we are not satisfied that on this record respondent has clearly and convincingly established fraud with respect to that year. First, the record does not establish that income "far in excess" of that reported on the 1977 return was realized by petitioner in 1977. Instead from the record as a whole, and in the absence of a *246 computation under Rule 155, it appears that the unreported income for 1977, if any, is substantially less than that determined by respondent. Furthermore, the record contains no evidence of any drug sales by petitioner in 1977 other than the vague and often confusing testimony by one witness which we have found to be untrustworthy. The record, however, does contain a great deal of evidence, which as we have found, requires substantial adjustments to respondent's computation for 1977 for such items as receipts from non-taxable sources, the accumulation of cash during the year, and the allowance of certain deductions. We are also unable to consider petitioner's failure to file the amended return for 1977 as being evidence of fraud because the existence of the lump-sum distribution reflected in the amended return had been disclosed to respondent by petitioner's election on the original return for 1977 to have any lump-sum distributions taxed under section 402. Decision will be entered under Rule 155.
Appendix A
Respondent's Revised Adjustments to Income
1977
1978
Type of Expenditure
Budget & Child Support
Food
$4,000.00 $4,000.00 Personal care
400.00 400.00 Real property and
other taxes
6,493.00 7,240.00 Mortgage payments
7,151.00 7,151.00 Contributions
100.00 BLS Budget Total
25,202.00
27,420.00
Less items
18,144.00
7,058.00 18,791.00
8,629.00 listed above
Plus income taxes above
(under) budget amount
695.00 (3,000.00)
Support for wife
and children
10,770.00 9,200.00 Total budget and
child support
36,667.00 33,620.00 Type of Expenditure
Personal Drug Usage
182,000.00 182,000.00 Farm Expenses
Payments to David Seamans
2,732.00 275.00 Cow purchase (Martsolf)
1,000.00 Cow purchase (Jameson)
2,800.00 Bull purchase (Simpson)
5,500.00 Pig purchase (Hodge)
200.00 Purchase of mares
6,000.00 Purchase of pigs & a boar
750.00 Tractor purchased
500.00 Cow purchase (Ed Yeo)
5,000.00 Feeding of pigs
4,380.00 1,000.00 Feeding of cows
7,665.00 2,000.00 Feeding of horses
1,825.00 450.00 Total farm expenses
38,352.00 3,725.00 Cash accumulated
80,000.00 80,000.00 Capital gains
19,056.00 4,804.00 Agricultural subsidy
78.00 Less exemptions
(3,000.00)
(3,000.00)
TOTAL REVISED
ADJUSTMENTS TO INCOME
353,153.00 301,149.00 *247 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner elected special ten year averaging of the lump-sum distribution pursuant to section 402(a), (e). Of this $67,643.49, $28,990.07 is the ordinary income portion and $38,653.42 is the capital gain portion. ↩
3. Petitioner elected special ten year averaging of the lump-sum distribution pursuant to section 402(a), (e). Of this $103,122.16, $44,195.21 is the ordinary income portion and $58,926.95 is the capital gain portion. ↩
4. The sales price was $57,500.00, but only $8,700 was received in 1977 and only $385 in 1978.↩
5. In addition to the above adjustments, respondent determined that for the year 1977 petitioner owes $13,593.66 in additional income tax as a result of the lump-sum distribution from the profit sharing plan.↩
6. At trial, a photocopy of the written statement was admitted under rule 803(5) of the Federal Rules of Evidence↩ as being a memorandum about a matter of which Ryan once had knowledge but at the trial had insufficient recollection to enable her to testify fully and accurately. Ryan's written statement which is barely legible, contains the following: "Jim told me [he] carried as high as 100 or 160.00 in a case[.] Sometimes I don't know if that was true[.] I had held large Sums of Money for Jim." On the copy which was offered by respondent, Ryan's statement had been obviously altered after it was photocopied by adding a zero to change the "160.00" to "$160,000." Respondent made no attempt to bring this alteration to the Court's attention during the trial or to explain why or by whom it was made even though he relied on the altered figure in his briefs.
7. We note that a deduction for depreciation would normally be allowable with respect to the breeding animals and the tractor but the record does not contain evidence from which we can determine their useful lives. Consequently on this record no deduction for depreciation is allowable.↩
8. Section 402(e)(1) provided in pertinent part: (1) Imposition of separate tax on lump-sum distributions. -- (A) Separate tax. -- There is hereby imposed a tax (in the amount determined under subparagraph (B) on the ordinary income portion of a lump-sum distribution. (B) Amount of tax. -- The amount of tax imposed by subparagraph (A) for any taxable year shall be an amount equal to the amount of the initial separate tax for such taxable year multiplied by a fraction, the numerator of which is the ordinary income portion of the lump-sum distribution for the taxable year and the denominator of which is the total taxable amount of such distribution for such year. (C) Initial separate tax. -- The initial separate tax for any taxable year is an amount equal to 10 times the tax which would be imposed by subsection (c) of section 1 if the recipient were an individual referred to in such subsection and the taxable income were an amount equal to $2,200 plus one-tenth of the excess of- (i) the total taxable amount of the lump-sum distribution for the taxable year, over (ii) the minimum distribution allowance.↩