PAUL P. SLAWEK AND SUSAN C. SLAWEK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; SLAWEK ENTERPRISES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Slawek v. Commissioner
Docket Nos. 1703-81; 29482-81; 29483-81.
United States Tax Court
T.C. Memo 1987-438; 1987 Tax Ct. Memo LEXIS 435; 54 T.C.M. (CCH) 364; T.C.M. (RIA) 87438; August 31, 1987; As amended September 1, 1987 *435 Held: Respondent failed to prove addition to tax under sec. 6653(b); various factual issues including the credibility of Dr. and Mrs. Slawek determined so that the parties can compute taxable income for the years involved. Paul P. Slawek, pro se. James P. Clancy, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies and additions to tax against the several petitioners as follows: Paul P. Slawek and Susan C. Slawek Docket
Additions to Tax
No.
Year
Tax
Section 6653(b) [1]
1703-81
1970
$ 2,220.20
$ 1,110.10
1971
10,286.00
5,143.00
29482-81
1973
21,118.00
10,559.00
1974
46,677.00
23,393.00
Slawek Enterprises Inc. -- Docket No. 29483-81 Fiscal Year
Additions to Tax
Ending June 30
Tax
Section 6653(b)
1973
$ 23,393.00
$ 11,697.00
1974
19,096.00
9,548.00
The issues for decision are: (1) Whether the statute of limitations bars the assessment of deficiencies for any of the years; (2) the determination of the correct taxable income of the individual petitioners *436 and of the corporate petitioner for each of the years; (including, among others, sub-issues such as substantiation, profit objective, legal fees, innocent spouse, and procedural matters), and (3) the determination of the fraud addition. [2]
Background Facts
Some of the facts have been stipulated and are found accordingly. At the time of filing of the petitions in this matter Paul P. and Susan C. Slawek (Dr. Slawek and Mrs. Slawek) resided in Lafayette Hill, Pennsylvania. Petitioner Slawek Enterprises, Inc. (Enterprises) had its principal place of business in or in the vicinity of Philadelphia, Pennsylvania, during its 1973 and 1974 fiscal years. During the entire period 1970 through 1974, Dr. Slawek was engaged in the practice of medicine as a general practitioner with his office located in the community of Roxborough in the vicinity of Philadelphia. For a portion of the time, Dr. Slawek also maintained an office in petitioners' home in Lafayette hill. During most of this time period, Mrs. Slawek assisted *437 Dr. Slawek with some of the administrative work of the office. The audit of petitioners was triggered by a newspaper article reporting in substance that Dr. Slawek was earning $ 100,000 a year as a doctor. One or more of his tax returns were examined by respondent and it was noted that his gross income was a small fraction of $ 100,000. Therefore, a fraud investigation by respondent was initiated. This fraud investigation was closed for lack of evidence and the case was then referred to revenue agents for civil audit which took a number of years to complete and occupied a number of different agents. The tax returns of Dr. and Mrs. Slawek through 1973 were prepared by two successive tax return preparers or public accountants. The two fiscal year returns of Enterprises were also prepared by the second of the accountants. Information was given to the preparers somewhat in summary form, based upon books and records maintained by the Slaweks and Enterprises. Patient records, on which fee payments were recorded, were not made available to the preparers at least for the years 1972, 1973, and 1974. Adequate books and records were maintained by the Slaweks and by Enterprises although *438 there was little, if any, effort made by Dr. Slawek to separate his personal transactions and expenses from those of Enterprises, with resulting confusion which only a careful and conscientious audit would unscramble. Unfortunately, by the time of trial much of the recorded information had been lost due in large measure to the passage of time, the fact of an intervening bankruptcy, and careless work on the part of respondent's agents as well as Dr. Slawek. It appears to the Court as though the revenue agents who took over the civil audit after the closing of the fraud investigation had received instructions to determine a civil fraud addition irrespective of the facts. [3] *439 Three notices of deficiency were issued in this case -- for the Slaweks' calendar years 1970 and 1971 on November 19, 1980, for the Slawek's calendar years 1973 and 1974 on October 30, 1981, and for the Enterprises' fiscal years 1973 and 1974 on October 30, 1981. No deficiency was determined for 1972. For convenience and to the extent practicable we combine the remainder of our Findings of Fact and our Opinion under the several discrete issues which must be determined, recognizing, however, that many of the issues are interdependent and facts set forth under each successive issue are frequently material to issues discusseed thereafter.
Credibility of Dr. and Mrs. Slawek
Much of the resolution of this case depends on the credibility of Dr. Slawek as a witness. The trial covered parts of 7 days during which time we observed Dr. and Mrs. Slawek closely, both while testifying under oath and in general during the presentation of the case. We found Dr. Slawek to be an opportunist, ever alert to seize any opportunity to attempt to confuse the issue as well as opposing *440 counsel. He took advantage of ambiguities and half truths, he exaggerated, and was willing to leave false impressions by giving truthful but inadequate answers to questions. He paid little attention to details. However, it is our judgment that neither Dr. Slawek nor Mrs. Slawek intentionally testifying falsely in the sense of fabricating specific facts. When asked a narrowly focused question, Dr. Slawek gave truthful answers to the best of his ability. It is quite evident, however, that one must ask the right question in order to obtain the right answer. We have, therefore, examined Dr. Slawek's testimony in order to distill from it facts separated from exaggerations and from misimpressions generated by ambiguities, half truths, or incomplete answers. We have understandably resolved ambiguities against Dr. Slawek and relied upon his testimony only when corroborated by other disinterested testimony, documentary evidence, the context of the fact situation, or in some cases by our own knowledge of human experience. Mrs. Slawek was entirely credible, even when doing her best to support positions taken by her husband. We are also convinced and find that neither Dr. nor Mrs. Slawek *441 would intentionally file a false Federal tax return. Whether Dr. Slawek's combative attitude reflects his perception of the attitude and conduct of respondent's agents and counsel we need not determine, but there has been substantial justification for such an attitude. The combination has severely impacted upon our fact finding as our discussion of the issues will make clear.
Statute of Limitations Issue[4]
In their petition, petitioners allege that all of the years are barred by the statute of limitations because all extensions were obtained by intimidation and duress. There is no proof to substantiate this contention, it is meritless and we consider it to have been abandoned. In this connection, see generally Houlberg v. Commissioner,T.C. Memo. 1985-497, and Harrington v. Commissioner,T.C. Memo. 1984-428, affd. without published opinion 774 F.2d 1158 (5th Cir. 1985). During trial and on brief petitioners insist on this issue for the Slawek's calendar years 1973 and 1974 and for Enterprises' fiscal years 1973 and 1974 on the theory that Dr. Slawek's signature *442 on two powers of attorney was forged. For the years 1970 and 1971, the Slaweks were represented by an attorney, Joseph S. Binder, who is a member of the Bar of this Court, during the audit phase. Petitioners undertook to represent themselves and Enterprises during the audit of the later years up to the filing of protests. On various dates during the years 1976, 1977, 1978, and 1979, Dr. and Mrs. Slawek signed Forms 872, the last of which, dated August 15, 1979, extended the statute of limitations with respect to the individual years 1973 and 1974 to December 31, 1980. Similarly, Dr. Slawek as president of Enterprises extended the statute of limitations for the fiscal years 1973 and 1974 on various dates during the period 1976 through 1979 to December 31, 1980. The last Form 872 for Enterprises was signed by Dr. Slawek on August 15, 1979. On October 6, 1980, Mr. Binder, as the taxpayers' representative, signed Forms 872-A for Dr. and Mrs. Slawek individually, and for Enterprises pertaining to the 1973 and 1974 calendar and fiscal years. These Forms 872-A were executed by Mr. Binder pursuant to powers of attorney dated September 12, 1980, purporting to be signed by Dr. and Mrs. *443 Slawek individually and by Dr. Slawek as president of Enterprises. The powers of attorney were duly filed by Mr. Binder with respondent. The powers of attorney permitted Mr. Binder to discuss with respondent's agents the protests which he had filed on July 28, 1980, responding to 30-day letters covering the 1973 and 1974 calendar and fiscal-year adjustments. These two powers of attorney had been transmitted by Mr. Binder to Dr. Slawek at his office for signature by him and Mrs. Slawek by letter dated September 8, 1980. Dr. Slawek was not in his office on September 12, 1980, the date affixed to the powers presumably by one of the persons who signed them. The powers of attorney were received by Mr. Binder's office (presumably by United States mail) sometime between September 8, 1980, and October 6, 1980, when Mr. Binder signed the Forms 872-A. Mr. Binder commenced representing Dr. Slawek in 1978 with respect to the years 1970, 1971, and 1972. He first commenced representing the Slaweks and Enterprises in connectionwith the years 1973 and 1974 during the summer of 1980. Mr. Binder and Dr. Slawek exchanged correspondence about the 1973 and 1974 years at least twice during July *444 1980. A set of powers of attorney were obtained during July but the tax years were not filled in and thus those documents were worthless. Unfortunately they are not in the record. Prior to July 28, 1980, the date protests were filed by Mr. Binder, Dr. Slawek had furnished to Mr. Binder the 30-day letters so that Mr. Binder could prepare the protests. In January and in December 1981, Mr. Binder sent invoices to Dr. Slawek covering costs incurred in connection with the years 1973 and 1974, including the filing of the protests and the petitions filed on December 7, 1981. During the trial Dr. Slawek and Mrs. Slawek discovered and testified that the signatures on the powers of attorney purporting to be that of Dr. Slawek were not genuine. Mrs. Slawek testified that her signature could not be genuine since she would not have signed the documents unless they had first been signed by Dr. Slawek. She finally conceded, however, that she might have signed the powers of attorney before Dr. Slawek's signature was affixed. Examination of the disputed signatures by respondent's expert document examiner confirms, and we so find, that Dr. Slawek's signature was not genuine. It differed from samples *445 of genuine signatures beyond the limits of normal variation. Also it was not traced or copied from a genuine sample. It appears that the same person affixed Dr. Slawek's signature to both powers of attorney. We find that Mrs. Slawek's signature was affixed by her and is genuine. The evidence shows that on many occasions Dr. Slawek signed documents such as tax returns for Mrs. Slawek and is able to do so with sufficient accuracy to confuse a document examiner as well as any nonexpert looking at the signatures, but there is no evidence suggesting that he affixed Mrs. Slawek's signature in this instance. Neither is there evidence that Mrs. Slawek had acquired the same expertise in copying her husband's signature that Dr. Slawek had in copying his wife's signature. There is no contention that Dr. Slawek's signature was affixed by Mrs. Slawek. It is apparent that the author of the nongenuine signatures of Dr. Slawek had available samples of his signature or was otherwise familiar with it, since the nongenuine signatures resemble the genuine signature closely enough to mislead a person who is not intimately familiar with the variations of Dr. Slawek's genuine signatures or is not a trained *446 document examiner. Even with the benefit of the expert testimony and the document examiner's signature comparison chart, we find it difficult to distinguish the admittedly genuine samples from those on the powers of attorney. There is no evidence in this record as to the identity of the person who actually signed these two powers of attorney on behalf of Dr. Slawek. It is not unusual for a trusted employee in a doctor's office to sign documents for the doctor. We assume that this practice prevailed in Dr. Slawek's office but there is no evidence on this point in the record. Dr. Slawek testified that no one was expressly authorized by him to affix his signatures to these powers of attorney and we accept his testimony. We conclude that the powers of attorney were signed in Dr. Slawek's office by someone intimately familiar with his signature who must have affixed Dr. Slawek's signature on the belief that he or she was or would have been authorized to do so if the need for expediting the return of the documents to Mr. Binder had been known to Dr. Slawek. The signature of Mrs. Slawek on the individual power of attorney may have impacted on the belief of the person who affixed Dr. *447 Slawek's signatures that such action was appropriate. We note that during this period a sister of Dr. Slawek was working for him as his secretary and as secretary-treasurer for Enterprises. However, no one inquired of this witness if she knew anything about these powers of attorney, or if she had ever affixed Dr. Slawek's signature to a document with his authorization or otherwise. Dr. and Mrs. Slawek both knew or are held to have known that the existing Forms 872 which admittedly contain genuine signatures, expired on December 31, 1980, and that the Internal Revenue Service would not meet with Mr. Binder without powers of attorney. Petitioners knew or should have known that notices of deficiency would have been issued by respondent prior to December 31, 1980, unless the years were further extended. Dr. and Mrs. Slawek intended that Mr. Binder represent them and Enterprises before the Internal Revenue Service for the 1973 and 1974 tax years, and Mr. Binder did so pursuant to the two powers of attorney. Respondent's agents acted reasonably in relying upon the powers of attorney as did Mr. Binder. Petitioners contend that Dr. Slawek's signatures on the powers of attorney were forgeries. *448 However, by definition a forgery refers to a signature affixed to a document with a purpose or intent to defraud or injure the person whose signature is forged. Black's Law Dictionary, 585 (5th ed. 1979). In this instance the powers of attorney were needed by Dr. Slawek's attorney and the affixing of the signatures was intended as a benefit to, and did in fact benefit Dr. and Mrs. Slawek and Enterprises. No harm resulted from affixing Dr. Slawek's signatures even without his knowledge or authorization. There was no forgery. It is also quite apparent that Dr. Slawek would have ratified and approved the powers of attorney if requested to do so or would have signed new powers of attorney. From the facts before us we draw the inescapable inference that a trusted employee in Dr. Slawek's medical office affixed his signatures to the powers of attorney, probably in reliance upon an existing office practice of affixing Dr. Slawek's signature as needed. The fact that Mrs. Slawek's signature already appeared on the documents was no doubt influential. By allowing Mr. Binder to represent him and Enterprises before the Internal Revenue Service, Dr. Slawek ratified and approved the action *449 of that unknown person who affixed his signatures. In so doing Dr. Slawek adopted the powers of attorney as his own, both individually and on behalf of Enterprises. Further it was incumbent on Dr. Slawek to inquire as to Mr. Binder's authority to act, if in fact Dr. Slawek did not at the time understand that Mr. Binder was acting upon an apparently valid power of attorney. It was further Dr. Slawek's obligation to inform Mr. Binder as to the expiration of the latest Form 872 filed by Dr. Slawek with the Internal Revenue Service, which in all likelihood he did, so that appropriate action could be taken to extend the statute. Respondent's action in reliance on the apparently valid powers of attorney creates an estoppel. See, e.g., SEI Corp. v. Norton & Co.,631 F. Supp. 497 (E.D.Pa. 1986). Dr. Slawek received the benefit of the powers of attorney and respondent acted to his detriment in relying upon the powers of attorney and the Forms 872-A. Dr. Slawek, Mrs. Slawek, and Enterprises are now estopped to deny Mr. Binder's authority. Thus both on the grounds of estoppel and ratification we hold that Mr. Binder was acting pursuant to valid powers of attorney in signing the Forms 872-A *450 on behalf of his clients. The statute of limitations was duly extended on behalf of Dr. and Mrs. Slawek for their calendar years 1973 and 1974 and on behalf of Enterprises for its fiscal years 1973 and 1974.
Motion to Shift the Burden of Going Forward
On February 7, 1985, petitioners filed a motion to shift the burden of proof, treated as a motion to shift the burden of going forward with the evidence, to respondent on the grounds that the notices of deficiency were arbitrary within the meaning of Helvering v. Taylor,293 U.S. 507 (1935). We took the motion curia advisari vult. Respondent reconstructed the income of all petitioners for each of the years using the bank deposits/expenditures method, although with respect to Enterprises respondent also used that corporation's receipts journal. Respondent justifies use of this method of reconstructing income on the grounds that petitioners failed to produce adequate records of their income and expenses for the years at issue. Years 1970 and 1971: The revenue agent who performed the audit for the years 1970 and 1971 worked in Dr. Slawek's office during 1976 and 1977 and had full access to the office and to Dr. Slawek's records. The *451 agent knew the results of the criminal fraud investigation and knew that the conclusion of the investigation was that Dr. Slawek's income did not differ significantly from that shown on his tax returns and that his apparent increase in assets resulted from borrowings. The agent also knew that there were many documents available including a multitude of copies of documents contained in respondent's administrative file, many of which were not used or examined by the agent. Instead he used the bank deposits method to recalculate Dr. Slawek's gross receipts. Apparently, the revenue agent had so many documents to check that he sought to short-circuit his audit task by using the bank deposits/expenditures method, but did not attempt to verify conclusions reached by this indirect method with available records. Based on records produced for purposes of trial, respondent now concedes that there were numerous errors in the calculations which led to the statutory notice covering the years 1970 and 1971. Respondent concedes in the first stipulation that there are no unreported gross receipts for the year 1970 and that the gross receipts for the year 1971 were understated by approximately $ *452 25,000 rather than almost $ 34,000 as stated in the statutory notice. Respondent has considerable discretion in the use of indirect methods to determine income. However, where a taxpayer's records are available and are apparently reliable and complete, it is incumbent upon respondent to utilize such records. Estate of Hill v. Commissioner,59 T.C. 846, 857 (1973). Respondent may, of course, use an indirect method such as this in order to test the accuracy of a taxpayer's books and records and to check for unreported income but that does not excuse respondent's failure to check the books and records made available to him. Indirect methods merely supply evidence of unreported income. See Bushnell v. Commissioner,49 T.C. 296, 310-313 (1967). The calculations in respondent's statutory notice covering the years 1970 and 1971 are grossly incorrect as respondent has conceded, but whether this rises to the level of arbitrary action which under Helvering v. Taylor, supra, would shift to respondent the burden of going forward with the evidence is a close question. Tax Years 1973 and 1974: With respect to the two fiscal years of Enterprises, gross receipts were determined by comparing *453 bank deposit statements with the gross receipts journal and attributing to Enterprises the larger of the two amounts of gross receipts for each month. It is quite apparent that gross receipts shown in the journal at the end of one month might also be reflected as deposits on the bank statements for the following month. The only expenses allowed Enterprises were the wages reflected on payroll tax returns in respondent's records. The difference between these gross receipts and wages was characterized as a constructive dividend to the individual petitioners. In so doing, respondent's agents simply ignored (probably through ignorance as a result of failure to inquire) the fact that the entire net income of Enterprises constituted compensation to Dr. Slawek pursuant to his employment contract. For the individual petitioner's calendar years 1973 and 1974, respondent simply increased the reported income of petitioners by the amount of the constructive dividends. Thus, the accuracy of the statutory notices for the 1973 and 1974 tax years depends entirely upon the accuracy of the determination of the taxable income of Enterprises. Respondent has again conceded that there were substantial *454 errors in determining the taxable income for each of these years. Thus the deficiencies determined against Enterprises and against the individual petitioners are overstated for these years. The agents apparently used no books and records of Enterprises or of the individual petitioners other than the cash receipts ledger and made no effort to conduct a thorough audit. It should have been apparent to respondent's agents that no active medical practice can be carried on by a doctor without incurring expenses other than wages. Also respondent's agents made no genuine effort to verify the facts as to the multiple loans outstanding which at some point during the period 1972-1974 equaled $ 360,000 or as to property owned by Dr. Slawek at the beginning of the period, which included a valuable coin collection which he sold during the period and medical equipment. Respondent's actions in this case with respect to the 1973 and 1974 tax years, especially in increasing the individual petitioners' income, are arbitrary as well as unreasonable within the meaning of Helvering v. Taylor, supra.Respondent cannot simply ignore a taxpayer's records. The inaccuracy of respondent's determinations has *455 been established. See Giddio v. Commissioner,54 T.C. 1530, 1533-1534 (1970); Herberg v. Commissioner,T.C. Memo. 1987-229. This would shift the burden of going forward with the evidence, but not the ultimate burden of persuasion. See Tannenwald, J. concurring Llorente v. Commissioner,74 T.C. 260, 272-280 (1980), affd. in part and revd. in part 649 F.2d 152 (2d Cir. 1981); Anastasato v. Commissioner,794 F.2d 884, 887 (3d Cir. 1986). However, the question of which party has the burden of going forward with the evidence is in fact immaterial. Both parties offered as much evidence as we were willing to receive. As our discussion of other issues will show, we have resolved each of the issues before us on the basis of the entire record without regard to the burden of going forward. The presumption of correctness attached to the statutory notices is immaterial and the direction of the Court in Helvering v. Taylor, supra, has been carried out. For this reason, petitioners' motion is denied.
Charter Boat Venture
In the year 1970, Dr. and Mrs. Slawek claimed depreciation and investment tax credit on a motor boat named Dotty Marie which they purchased as a used boat in mid-1970 for $ 55,000 *456 for use as a charter boat. In 1971, the vessel was sold for $ 36,000 because the venture proved to be unprofitable. Dr. and Mrs. Slawek in 1971 claimed a loss on the vessel. The issue is whether Dr. and Mrs. Slawek purchased and utilized the Dotty Marie with the requisite profit objective. Respondent contends that the activity was not engaged in for profit and consequently the provisions of section 183 are applicable. Petitioners in an earlier year acquired another boat, the Monaloa, which was disposed of in 1970. [5] We do not have in the record the date or purchase price of this boat or the date of sale and sale price. Dr. and Mrs. Slawek also claimed depreciation on the Monaloa in 1970, and operating expenses in both years on both boats in excess of the amounts claimed on the tax returns. Prior to 1969, Dr. Slawek had had some experience in the use and operation of motor boats, had owned one or more small boats, and had some knowledge of the boat-chartering business, although no personal experience in chartering as a *457 boat owner. Mrs. Slawek had no knowledge of boats and little interest in them. The Slaweks in 1969 decided to purchase a large motor boat in order to go into the boat-chartering business. They thereupon acquired the Monaloa, a 50-foot Elco. We do not know what use, if any, was made of the Monaloa in 1969. By early 1970, arrangements had been made to have the Monaloa available for charter from the Atlantic City State Marina in Atlantic City, New Jersey. At least by June 1970, petitioners advertised the Monaloa for charter in the Wall Street Journal. On a date unknown but between June 21, 1970, the date of the Elco ad, and August 2, 1970, the date of the first ad in this record for charter of the Dottie Marie, the Slaweks acquired the Dottie Marie, a 55-foot Chris Craft. At least through August 1970, both boats were advertised for charter in the Wall Street Journal. The Monaloa was eventually sold during 1970, and the Dottie Marie was sold on December 4, 1971, for $ 36,000. During the 1970 season, there were at least six charters covering one or the other of two boats which generated about $ 6,000 of gross income. During 1970, petitioners incurred maintenance and operating *458 expenses for both boats of not less than $ 3,443.62. In 1971, petitioners incurred operating and maintenance expenses for the Dotty Marie in an amount not less than $ 2,825.60. [6] In addition, during the period of ownership of the Dotty Marie, petitioners incurred costs with respect to this boat, which are required to be capitalized, in an amount not less than $ 451.14. [7]
Before purchasing the first of these two boats, petitioners made no real investigation of the charter-boat business. They made no projections *459 of income and expenses as a basis for estimating whether or not the project could be profitable. Although Dr. Slawek apparently enjoys boating and fishing, there is no evidence before us showing that there was any significant use of either of these boats for Dr. Slawek's recreational purposes. Section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Section 183 permits these deductions to a limited extent if the activity is not engaged in for profit. Sec. 183(b). [8] Whether the Slaweks' charter activity was engaged in for profit depends on whether they engaged in the activity with an actual honest objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The Slaweks' expectation of profit need not have been a reasonable one but they must have entered into the activity, or continued the activity, with the bona fide objective of making a profit. Engdahl v. Commissioner,72 T.C. 659, 666 (1979). Profit objective is a question of fact to be determined from all of the facts and circumstances. Allen v. Commissioner,72 T.C. 288, 34 (1979); *460 Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Respondent's regulations set forth nine factors to be considered in determining whether an activity is engaged in for profit. Section 1.183-2(b), Income Tax Regs. However, whether the requisite profit objective exists in any case is a question of fact and greater weight will normally be given to objective facts than to petitioners' mere statements of intent. Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner, supra;sec. 1.183-2(a), Income Tax Regs.
Respondent disposes of this issue largely on the basis of the lack of credibility of Dr. and Mrs. Slawek. As we have already indicated, we recognize that there are credibility problems in connection with their testimony. However, in this case their testimony is corroborated. For example, the public accountant who worked on the Slaweks' returns for the years 1971, 1972, and 1973, testified that Dr. Slawek repeatedly *461 reiterated his objective of making a large profit in his charter-boat business. There is adequate evidence of efforts to charter the boat and of the fact of a number of different charters. We recognize that the Slaweks' tax returns do not show specifically the receipt of income from this activity since it was buried in deposits to Dr. Slawek's bank account. [9] That, however, is not the question here. Dr. Slawek's expectation of profit probably was not a reasonable one but as we have pointed out all that is required is that the activity be entered into, or continued, with the bona fide objective for profit. Engdahl v. Commissioner, supra.
We conclude that Dr. Slawek had a bona fide albeit unreasonable profit objective and to his credit he very quickly ceased the charter-boat business when it was demonstrated to him that it was not profitable. Under these circumstances, the expenses which we have determined above to have been incurred during 1970 and 1971 in the charter-boat business are deductible. In addition *462 to these deductions, petitioners claim both depreciation and investment credit in 1970, and in 1971 depreciation and ordinary loss on the disposition of the Dotty Marie. The investment credit was suspended prior to the year 1970 and was not restored until the latter part of 1971. 8 Mertens, Law of Federal Income Taxation, sec. 32A.02, p. 10-10a (1987); 3B Rabkin and Johnson, Federal Income, Gift and Estate Taxation, sec. 45A.07, p. 45A77 (1942). Since we have no facts in this record as to the cost, salvage value, or sale price of the Monaloa, we have no basis for allowing depreciation on that boat. With respect to the Dotty Marie, we have found the cost and some small amounts of capital additions. We find that the boat was placed in service not later than August 2, 1970. Petitioners on their tax returns use an approximate 6-year useful life for the Dotty Marie. Respondent has not argued that this useful life is unreasonable and there is case support for it. We find that a 6-year life is appropriate. We further conclude that a 10-percent salvage value should be taken into account. Hence, petitioners are entitled to a recomputed depreciation deduction for the year 1970 for 5 *463 months of use and in 1971 for 11 months of use. [10] In 1971 petitioners are also entitled to an ordinary loss representing the difference between their adjusted basis in the Dotty Marie on the date of sale and the sale price of $ 36,000. Ventnor City Yacht Club
In March 1971, Dr. and Mrs. Slawek purchased a large 3-story frame house on the water in Ventnor City, New Jersey, for $ 38,000. The house is referred to in this record as the Ventnor City Yacht Club (Yacht Club). [11] The house had among other things nine bedrooms, extensive porches, a large bar, and 150 feet of decking over the water with 10 to 12 boat slips. Petitioners' plan was to sell memberships which would entitle a member to use from time to time one of the bedrooms in the house with linen and utilities furnished. Apparently, a membership did not entitle the member to free use of a boat slip, but presumably rental of a slip was available to a member. Members also could utilize the bar, but apparently were required to furnish whatever they consumed. Mrs. Slawek personally did the cleaning, making of beds, etc. During 1971 petitioners rented several slips and held *464 two large parties funded by the party participants or an organization to which the participants belonged. [12] In 1972 approximately 25 memberships were sold. The memberships increased to 50 to 55 in 1974 and 1975. At a maximum during this period, eight to nine of the boat slips were rented. Mrs. Slawek and the Slawek children spent the summers at the house with Dr. Slawek commuting from Philadelphia as he could. The Slaweks regularly used for their own purposes one or two boat slips. The Yacht Club building burned to the ground in January 1976. Most records pertaining to the activity were burned. During the Slaweks' ownership, the property was not licensed by municipal authorities as a club. It was also described in newspaper articles and in correspondence by Dr. Slawek as a residence. Nevertheless, we find that Dr. and Mrs. Slawek purchased this property with a requisite profit objective, although the planning was faulty *465 and probably ill conceived. [13] We further find that business use of the property commenced in 1972. The Slaweks did make extensive personal use of the properrty, which Dr. Slawek concedes, although Mrs. Slawek's presence also had a business aspect. Using our best judgment, [14] based on the entire record, we conclude that personal use by the Slawek family was not in excess of 30 percent. Petitioners claimed depreciation on the property, and they are entitled to a depreciation deduction for the years 1973 and 1974. Although respondent has not questioned the mechanics of the computation by petitioners of the depreciation deduction, we note that the entire purchase price was allocated to the depreciable part of the property on the Slawek 1973 tax return. The land certainly had value. We estimate for this purpose that the cost was one-half land and one-half building with a 30 year life. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Petitioners are entitled to depreciate 70 percent of the building on this basis in 1973 and 1974. We further find that petitioners are entitled to deduct 70 percent of the expenses to which the parties have stipulated in the total amount of $ 185.02 *466 or an allowable deduction of $ 129.51 for the year 1971. We further find that gross receipts from memberships, parties, and slip rentals were deposited in one or more of the Slawek or Enterprises bank accounts during the years in issue. In addition to the stipulated sums, petitioners have submitted canceled checks [15] covering Yacht Club expenditures during the several years before us. Respondent objects to the allowance of any expenses on two grounds, that petitioners failed to show that the expenses were incurred for the purposes claimed and that the Yacht Club was not an activity engaged in for profit. We have disposed of the latter objection adversely to respondent. With respect to the first objection, payments to utilities and for fuel are self explanatory. The building had one telephone which must have been used by the Slaweks personally, by Dr. Slawek in connection with his medical practice, and by club members. Deduction of 70 percent of telephone bills will be a reasonable estimate. There are also explanations by Dr. and Mrs. Slawek of some Yacht Club expenditures *467 and no explanation for some. We, therefore, allow as a deduction in connection with the Yacht Club 70 percent of utility, repair, maintenance and other expenses, whether in the form of checks or cash expenditures, as explained by either Dr. or Mrs. Slawek. Their testimony as to such specific expenditures is accepted by us as truthful. Appropriate computations will be made by the parties in due course. [16] *468 See below under heading Redetermination of Tax Liabilities, infra. Petitioners also suffered a casualty loss in 1974 in an amount not less than $ 1,200. Office in the Home
Dr. and Mrs. Slawek claim depreciation on the home at Lafayette Hill purchased in June 1971 for $ 63,000. They also claim as business expenses deductible under section 162 a portion of expenses and investment tax credit on some of the furnishings and equipment used in the office in their home. They have documented certain expenses. Respondent simply argues that these are nondeductible personal expenditures and no investment tax credit is allowable. Respondent has refused to accept the almost overwhelming evidence that during the years in issue subsequent to the purchase of the home, Dr. Slawek did establish a medical office for emergency and after hours treatment of patients and that certain areas were set aside for storage of medical equipment, office files, and records. In addition, some business bookkeeping was carried out in these parts of the home. Dr. Slawek never obtained a business license to operate a medical office in his home. Nevertheless, he did maintain such an office. His violation of local ordinances, if a fact, is irrelevant. In the house there was during these years an area approximately 17' by 13 1/2' used as a waiting room for *469 patients and an area approximately 12 1/3' by 11 1/2' used for an examination room and office. In addition, approximately one-half of the entrance hall measuring 5 1/3' by 16' was necessary for access to the medical office and was used at least part of the time for this purpose. In addition, on a lower level a room approximately 22 1/2' by 17 1/2' was used for a business office and file room and an area of approximately 20' by 26 1/2 for storage. Based on the entire record, including the measurements submitted by both parties and the extensive testimony, we conclude that not less than 30 percent of the total square footage in the residence at 4418 Presidential Drive was used for business purposes for 6 months during the year 1971 and for the entire tax years 1973 and 1974. We estimate that at least one half of the purchase price should be allocated to the building and that it had a useful life of 40 years. [17] Depreciation will be computed accordingly. The investment tax credit was not available at the time of this purchase. However, petitioners are entitled to deductions in the appropriate years for 30 percent of the utility expense including telephone which they have substantiated. *470 To the extent stipulated or substantiated, petitioners Slawek would be entitled to depreciation on medical equipment and furnishings and investment tax credit for periods after its restoration. Guard Dog
Enterprises claims as a business deduction for the fiscal year 1973 the sum of $ 125 which was a payment to one Morton Halprin for a white English sheep dog. At least throughout 1973 the dog was kenneled at the medical office and used as a watch dog. Ultimately the dog was taken to the Slawek's home as a pet. We accept Dr. Slawek's description of the transaction for the use of the dog as a guard dog for the calendar year 1973 and for several years thereafter. However, the dog constituted a capital asset with a useful life which we determined to be 10 years. Enterprises is entitled to investment tax credit and 6-months depreciation for its 1973 tax year and 12-months depreciation for its 1974 tax year with respect to the dog's purchase price. [18]
Travel Expenses *471 Petitioners have documented certain out-of-town travel expenses by Dr. Slawek during the years, some of which are arguably related to appropriate attendance at professional conventions and for other professional purposes and some of which appear to be allocable to an issue described below under the heading "Chicago Lawsuit." We cannot, however, on this record attribute any of the specific expenditures to any of the possible purposes. Moreover, out-of-town travel expenses are subject to the additional substantiation requirements of section 274(d). Although Dr. Slawek is probably entitled to some deduction for out-of-town travel, there is no way we can make an estimate of the amount and therefore the entire claim is disallowed. [19]
Dr. Slawek did, however, use automobiles in his medical practice. It is almost impossible for a general practitioner to operate his practice without local transportation, some of which is, of course, nondeductible commuting but other travel is deductible. The difficulty in this record is the lack of a clear focus on this issue, with a few specific exceptions. Automobile repair expenses *472 identified in the testimony as related to a business automobile will be allowed. For depreciation purposes we will assume [20] that Dr. Slawek used one automobile during each of the years 1970, 1971, 1972, 1973, and 1974 partly for personal (including commuting) use and partly for necessary travel in connection with his medical practice and that the proportion of deductible medical use was 50 percent. Therefore, to the extent that depreciation, investment tax credit (subsequent to August 15, 1971), and either mileage or actual expenses can be determined from the facts in this record including testimony, these deductions will be allowed. It appears that Enterprises did not itself purchase a business automobile for Dr. Slawek although it probably did pay some of the maintenance and operating expenses. For the convenience of all concerned, we direct that all such automobiles will be deemed to have been owned by Dr. Slawek and deductions referable thereto will be claimed by him. To the extent that disbursements may have been made by Enterprises, the amounts will be treated as paid for his account as compensation. (See "Enterprises," infra. ) [20]
Chicago *473 Law Suit
Dr. Slawek fathered an illegitimate child born in Illinois on July 3, 1969. On July 7, 1969, the child was surrendered by its mother to the Covenant Home which on the following day placed the child for adoption. At some point thereafter the child's mother, with the concurrence if not at the instigation of Dr. Slawek, filed a suit seeking to invalidate the adoption. The mother's efforts were unsuccessful. In May 1970, Dr. Slawek filed a petition for a writ of habeas corpus in the Circuit Court of Cook County, Illinois, in an effort to have the adoption declared invalid. The Circuit Court ruled against Dr. Slawek who then appealed to the Supreme Court of Illinois. The adoptive parents in the trial and on appeal contended (among other grounds) that Dr. Slawek was an unfit parent. The natural mother of the child had lived in the vicinity of Philadelphia prior to the birth of the child and returned there sometime after the adoption where she remained for a period of time. Her lawsuit and that of Dr. Slawek received considerable news media publicity and generated local gossip in the area from which Dr. Slawek drew most of his patients. Petitioners Slawek contend that the *474 publicity in the Roxborough area where Dr. Slawek's principal medical practice was carried on included knowledge of the parental unfitness charges against him, that the publicity had an adverse effect on his medical practice and that at least a portion of the legal expense incurred in this Chicago litigation was designed to counter the charges of unfitness as a parent in order to protect the professional reputation of Dr. Slawek. A number of depositions appear to have been taken in the Philadelphia area on this issue for use in the Chicago lawsuit. The public knowledge of this matter did have an adverse effect on Dr. Slawek's practice although the extent of that adverse effect cannot be determined. However, there is no evidence that Dr. Slawek's fitness as a parent arose during the litigation by the natural mother to revoke the adoption. It was raised as an issue by the adoptive parents in Dr. Slawek's habeas corpus proceeding. Thus, the filing of Dr. Slawek's habeas corpus proceeding was not motivated in any respect by charges that he was an unfit parent. The issue of unfitness was in a sense caused by Dr. Slawek since it was made in response to his efforts to invalidate the *475 adoption. Legal expenses are deductible only if the cause of action had its origin in the taxpayer's business activities. United States v. Gilmore,372 U.S. 39, 49 (1963). The fact that the litigation may have adverse consequences to a taxpayer's business is insufficient. In a case such as this, we must look to the "origin of the claim" test as set forth in United States v. Gilmore, supra.The original of this claim is entirely personal, i.e., Dr. Slawek's efforts to invalidate the adoption proceeding and to secure custody of his illegitimate son. While we recognize that the entire matter, the fact that he fathered an illegitimate child as well as the question of his fitness as a parent, may well have had an adverse effect on the ability of Dr. Slawek to pursue his profession and directly upon his income from his medical practice, this effect cannot convert what was essentially a personal expense into a deductible business expense. Moreover, even were we convinced that in one or more of these years a predominate factor in pursuing the litigation was to protect Dr. Slawek's professional reputation, we have no basis on this record to prorate any portion of the fees between personal *476 and business. We, therefore, hold that no part of the legal fees or expenses incurred in connection with the Chicago litigation is deductible by petitiones in any of the years.
Fraud
Respondent determined additions to tax for fraud against petitioners Dr. and Mrs. Slawek for the years 1970, 1971, 1973, and 1974 and against Enterprises for its 1973 and 1974 fiscal years. In the first stipulation respondent concedes that there are no unreported gross receipts in Dr. and Mrs. Slawek's 1970 calendar year. On brief, respondent concedes that Dr. and Mrs. Slawek are not liable for the fraud addition for the year 1970. Under section 6653(b) respondent has the burden of proof by clear and convincing evidence. Section 7454(a); Rule 142(b). To meet this burden, respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner,80 T.C. 1111 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. *477 without published opinion 578 F.2d 1383 (8th Cir. 1978); Estate of Pittard v. Commissioner,69 T.C. 391 (1977). Fraud is not to be imputed or presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970); Otsuki v. Commissioner,53 T.C. 96 (1969). However, fraud may be proven by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. Rowlee v. Commissioner, supra.The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, supra at 105-106 (1969). The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States,317 U.S. 492, 499 (1943). A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. See Holland v. United States,348 U.S. 121, 137 (1954); Otsuki v. Commissioner, supra.However, the mere failure to report income is not sufficient to establish fraud. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962). Other badges of fraud which may be taken into account include: the making *478 of false and inconsistent statements to revenue agents, Grosshandler v. Commissioner,75 T.C. 1, 20 (1980); the filing of false documents, Stephenson v. Commissioner,79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984); understatement of income, inadequate records, failure to file tax returns, implausible or inconsistent explanations of behavior, concealment of assets and failure to cooperate with tax authorities. Bradford v. Commissioner,796 F.2d 303 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. The indicia of fraud upon which respondent relies in this case are the alleged substantial omissions or understatements of income for the tax years 1971, 1973, and 1974, the alleged concealment of reecords of income and deductions from respondent's agents, undisclosed sources of income which respondent now alleges to be from Cardiomobile, Inc. and from Dr. Slawek's invention known as Dial-A-Temp, and finally Dr. Slawek's concealment of facts from his tax return preparer for the year 1970, and from a different tax return preparer for the years 1972, 1973, and 1974. Dr. and Mrs. Slawek are also accused of falsifying records of transactions between them and Enterprises. *479 Finally, as evidence of fraud, respondent relies on alleged false testimony of Dr. Slawek. One of the difficulties with respondent's first basis for sustaining his addition to tax for fraud -- alleged understatement of income for the years -- lies in the gross inaccuracies in respondent's determinations. The omission of income for the year 1970 was originally small and, as we have pointed out, respondent has conceded that in fact there was no omission of income for that year. For the tax years 1971, 1973, and 1974 there may have been some omission of income; on this record it is impossible to make an accurate determination, a fact for which both respondent and Dr. Slawek must share the blame. This issue will be discussed in more detail below. Why the year 1972 was accepted as filed, respondent has not explained. The individual tax return for the year 1972 is not even made a part of this record. It seems highly improbably that any taxpayers, as prone to falsehoods and fabrications as respondent would have us believe the Slaweks to be, would underreport income in 1971, 1973, and 1974 and failed to do so in 1972. The short answer to the assertion of fraud is that we have not *480 found any reliable evidence of material (much less gross) underreporting as respondent charges. Neither have we found Dr. and Mrs. Slawek to be guilty of the fabrications and falsehoods charged by respondent. Moreover, we are convinced that had respondent's agents undertaken a careful and conscientious audit of the many books, records, and documents which petitioners had available during the early years of the audit, as an impartial and unbiased follow up to the terminated criminal fraud investigation, a very different picture would have emerged. Respondent complains bitterly that petitioners failed to disclose records to the revenue agents who actually worked up the statutory notices yet later inundated respondent's counsel and the Court with hundreds of documents. We have found during each of the years petitioners maintained reasonably accurate records of receipts and disbursements although, as we will discuss in more detail under the heading "Enterprises," the documentation of the relationships between Dr. and Mrs. Slawek and Enterprises is woefully inadequate. The existence of documents has been confirmed not only by individuals who worked in Dr. Slawek's office but by his *481 tax return preparer for the later years, and by several of respondent's agents. The special agent who conducted the criminal investigation covering the years 1969 through 1972 confirmed that Dr. Slawek's patient record cards contained records as to his income from fees. The fact that on the advice of an attorney, Dr. Slawek terminated the access of the special agents to patient records so long as a criminal investigation was pending is immaterial. There is no indication that access to patient records as well as all other books and records was or would have been denied to any of the many revenue agents who worked on phases of the civil audit. The criminal investigation was apparently concluded that in the fall of 1973 after the special agents had determined that the Slaweks' net worth appeared to be declining, that Blue Cross/Blue Shield reimbursements to Dr. Slawek were reasonably consistent with his reported income, that there was no evidence that Dr. Slawek had actually testified under oath that he had income of $ 100,000 a year and of particular importance to the instant years that the increase in the assets of Dr. and Mrs. Slawek appeared to have resulted from large loans. *482 Dr. Slawek, working with the second of his tax return preparers, documented loans of $ 350,000, and in October 1974, Mr. Slawek sought protection of the bankruptcy laws at which time his unsecured debts approximated $ 200,000. The revenue agent who prepared the work papers which resulted in the statutory notice covering the years 1970 and 1971 did his audit work in 1976 and 1977 well over 2 years after the termination of the criminal investigation. He was provided full access to the office and the records, had in his files many documents including copies of a multitude of checks "that were in disarray," but apparently found the task of examining the documents before him too burdensome. He short-cut his audit through the use of indirect methods. The agent who first worked on the years 1973 and 1974 left the case largely incomplete and apparently did not even check the prior agent's work papers. The agent who finally completed the latter audit never went to Dr. Slawek's business office, did not try to look at the journal which had been available to his predecessor who started the audit of those years and again simply undertook to complete the job with the latest possible expenditure *483 of time and effort. Dr. Slawek argues, and there is every reason to believe that he is correct, that many of the business records were los during the course of the extended audit -- a period of close to 9 years. We are convinced that following the completion of the criminal fraud investigation, there was never a determined effort on the part of respondent's agents to determine accurately the extent to which income was omitted from the returns, if any, and whether there was any real evidence of a fraudulent intent to evade taxes. We recognize that neither of the two tax return preparers who worked on petitioners' tax returns for this period was allowed to see the patient records. Whether this was done by Dr. Slawek out of a perhaps mistaken effort to maintain patient confidentially or for some other reasons we do not know. However, bank statements and canceled checks were made available. In the circumstances of this case, we do not deem excluding the preparers from patient records to be a significant badge of fraud. As to the falsifying of records of loans and sales between petitioners and Enterprises, and of salaries paid to the Slaweks by Enterprises, the facts as detailed *484 in that part of this opinion dealing with that issue simply do not rise to the stature of a badge of fraud. The tax return preparer, a public accountant who recommended and supervised the formation of Enterprises, was not qualified to practice law as he was doing. Neither was Dr. Slawek competent to establish the corporation and maintain the proper relationship between his professional, business, and personal activities. It appears that Dr. Slawek was advised to transfer his various business endeavors to Enterprises contrary to Pennsylvania law. Dr. Slawek relied on poor advice, which was never implemented in a satisfactory fashion. The lack of competent advice and the inability on the part of Dr. Slawek to implement the advice resulted in chaos in the relationships between Dr. Slawek and Enterprises, something to be expected under these circumstances. This is not, however, evidence of fraud. The evidence as to unreported income, other than based on the calculations of the deficiencies by the bank deposits/expenditures method, is negligible. In the case of a general practitioner such as Dr. Slawek, one obvious source of unreported income would be failure to record and deposit *485 cash fees received from patients but there is no evidence whatsoever in this record as to the amount of cash fees, if any, received or as to any failure properly to account for such cash fees as may have been received. Respondent made some effort to show that Dr. Slawek's volume of patients seen at his office was large. We conclude on this record that it was far closer to 50 patients per week than 50 patients per day. There is simply no evidence, circumstantial or otherwise, on the basis of which we can find that whatever errors may have been made in any of the tax returns filed by Dr. and Mrs. Slawek individually or by Enterprises were made with a specific intent to evade taxes which any one of petitioners knew or believed were owing. We have examined carefully the entire course of conduct of Dr. and Mrs. Slawek during these years as reflected in this record, and we are convinced that the requisite fraudulent intent did not exist. We find for petitioners on the fraud addition issues.
Innocent Spouse
On brief petitioners contend that Mrs. Slawek was an innocent spouse within the meaning of section 6013(e). It is unclear whether petitioners make the same claim with respect to deficiencies *486 which will be determined for any year. It is also not readily apparent that petitioners raised this issue before the trial. [21] However, assuming that we should consider the issue, we find for respondent for the reasons set forth. Section 6013 as amended by the Tax Reform Act of 1984 requires, among other matters, that the spouse claiming the benefit of innocent spouse relief prove that there was a substantial understatement of tax "attributable to grossly erroneous items" of the other spouse (sec. 6013(e)(1)(B)) and that taking into account all the facts and circumstances, it is inequitable to hold that spouse liable for the deficiency. Sec. 6013(e)(1)(D). Petitioners have failed to prove that any of the deductions which are in controversy constitute "grossly erroneous items" of Dr. Slawek (see Douglas v. Commissioner,86 T.C. 758, 762-763 (1986)) or that it would be inequitable to hold Mrs. Slawek liable for the deficiencies in tax ultimately to be determined. In fact, the contrary is clearly the fact. Evidentiary Objections
In Item 16 of the supplementary stipulation filed April *487 22, 1985, as the "First Supplementary Stipulation," respondent reserved a number of objections to various documents contained within the binder marked as Exhibit II-51. Almost all of the documents contained in this exhibit were objected to by respondent on the basis of relevancy. We decline to rule on each of those objections; rather, we have given consideration only to relevant and material evidence. In paragraph (b) of Item 16 respondent questions the authenticity of a number of documents and in paragraph (c) asserts hearsay objections to certain other documents. Respondent makes no comment about these objections on brief and we could, therefore, consider respondent to have waived the objections. However, it is possible that respondent was mislead by the Court's direction to state respondent's objections in the stipulation. Therefore we will treat them on the merits. Documents 14, 15, 16, and 17 contained in Exhibit II-51 are copies of corporate records. We are uncertain whether respondent is objecting on the basis that the testimony identifying these documents as a whole is inadequate or as to lack of explanation of the various items of expenditures contained therein. As *488 to the former, we find that the documents have been adequately identified and are what they purport to be but except as specific expenditures may be explained by checks, testimony, or stipulation, we attribute no weight to the contents of these several documents. To the extent that they are legible, they are meaningless without explanation. Documents 28 and 29 appear on their faces to be authentic but they are copies of third party records which are not self-proving and are clearly subject to a hearsay objection and are excluded from our consideration. Items 30 and 31 are copies of work sheets prepared by one of respondent's agents. Respondent's objection to these documents is overruled. To the extent legible, Item 32 consists of copies of checks, of statements of account, and a final item which appears on its face to be an auditor's work paper, probably prepared by one of respondent's agents. Without testimony or stipulation explaining the contents of these various documents, we can make and have made no findings of fact relative thereto and their admissibility is moot. [22] Items 33, 34, and 35 are again copies of work papers prepared by respondent's agents and respondent's *489 objection on the grounds of authenticity is overruled. Items 36, 37, and 38 were properly authenticated by testimony. Items 39 through 42 are copies of income records of Dr. Slawek or of Enterprises as respondent well knows and respondent's objection on basis of authentication is frivolous. Item 42 contains a copy of what purports to be a Form 1099 issued by Pennsylvania Blue Shield to Dr. Slawek and a similar form issued by the Pennsylvania Department of Public Welfare, showing the total of payments to him during the year 1973. Since neither of these Forms appears to be an official Internal Revenue Service Form 1099, they are probably hearsay in the absence of testimony identifying them which is not in this record. However, by a second supplementary stipulation, prepared and signed at the request of the Court, we have before us copies of these Forms 1099 for the taxable year 1973 from Pennsylvania Blue Shield and from Commonwealth of Pennsylvania, Department of Public Welfare. Item 42 is unnecessary and is excluded from consideration. Certain of the remaining items, numbers 45 through 81 inclusive, have probably not been properly authenticated or are hearsay or both. These *490 items are largely supportive of testimony by Dr. Slawek of his indebtedness and the fact of his bankruptcy filing and are cumulative and therefore unnecessary. Accordingly we sustained respondent's objections thereto. Document 18 is an unsigned copy of an affidavit and would not be admissible over respondent's hearsay objection if signed. Therefore respondent's objection to this document is sustained. Document 19 is clearly subject to respondent's hearsay objection and is excluded. Enterprises
The Articles of Incorporation of Enterprises as a professional association were filed with the Department of State on June 8, 1972. Its charter authorizes it to do "any lawful act" under the Professional Corporation Law. Formation was the idea of Fred Crowley, the public accountant who prepared tax returns for petitioners during the period 1971 through the close of the second fiscal year of Enterprises. The fiscal year 1974 return was dated by Mr. Crowley on September 20, 1974. The reason for incorporating the medical practice was that Dr. Slawek was involved in many ventures such as the charter-boat *491 business, the Yacht Club, and the Cardiomobile unit. Mr. Crowley advised that those enterprises along with the medical practice should all be brought under the umbrella of a corporation. [23] Mr. Crowley did not follow up on his recommendation to Dr. Slawek and it is apparent that he did not possess the expertise to do so. Mr. Crowley never saw a salary contract or a sales agreement with respect to the alleged sale of medical assets to Enterprises. We do not know what bookkeeping advice he provided, if any. The record contains a copy of a handwritten document dated June 15, 1972, which is the organizational meeting of Enterprises. It states, as does the charter, that the officers of Enterprises are Dr. Slawek as president, Mrs. Slawek as vice president, and Mr. Crowley as secretary with offices at the location of the medical practice. Dr. Slawek was the sole shareholder. Terms of a lease from Dr. and Mrs. Slawek to Enterprises are outlined. As rent Enterprises was to make the mortgage payments on the office building and *492 pay the utilities and maintenance expenses for 1 year from July 1, 1972. A $ 1,000 loan from Dr. Slawek provided the incorporation expenses. These minutes also specify that Enterprises was to collect the gross income generated by Dr. Slawek, but to retain only that generated by the Roxborough office, to pay all medical and legal expenses of the medical practice, including all professional help, and to pay transportation expenses of Dr. Slawek and of all professional help. It provides that net income belongs to Dr. Slawek as his compensation. This document is signed for Enterprises by Mrs. Slawek and for Dr. Slawek by himself. On the reverse side of this document are similar notes of meetings of August 16, 1972, and August 22, 1972, one referring to a medical/legal plan for employees and the other purporting to approve payment for certain employee meals. While brief and ambiguous, these documents furnish an outline under which the professional association operate and fix the basis for compensation to Dr. Slawek. An "Agreement of Sales" dated September 15, 1972, transferred certain described medical equipment to Enterprises for $ 15,000 and a related document styled "Security *493 Agreement" gave Dr. and Mrs. Slawek a security interest in the medical equipment for the $ 15,000 promissory note. There is a similar multi-page document dated June 30, 1973, which transfers other medical equipment. On the last page of this document there is a longhand partially illegible legend dated September 12, 1974, which reflects the return of the equipment to Dr. Slawek in settlement of the then unpaid indebtedness of $ 17,920. The two sale agreements are sufficient under Pennsylvania law to transfer title to the medical equipment as described. Although Enterprises was treated by both parties as having gone out of existence after the end of its second fiscal year, its bank account was used for some period of time thereafter by Dr. Slawek and there is no evidence in this record as to whether any formal or informal action was actually taken to terminate the existence of the corporation. The June 15, 1972, minutes corroborate Dr. Slawek's testimony that his employment relation with Enterprises entitled him to receive as salary all the income generated by him as a doctor less the expenses. A corporate bank account was established but bills were paid from whatever funds were *494 available. Use of a particular bank account was dictated by the location of available funds and perhaps by where Dr. Slawek happened to be physically present at the time a check was written. No realistic effort was made by Dr. and Mrs. Slawek to separate personal business from the Roxborough office practice. There is no evidence that the existence of Enterprises was known to anyone other than the Slaweks, Mr. Crowley, and perhaps to other office personnel. We doubt that any patient was ever informed of the existence of the corporation. There is no evidence that any equipment or supplies were acquired in the name of Enterprises or that it obtained any license to do business. Ordinarily a taxpayer is bound by the form of a transaction which he uses and cannot argue that substance justifies a different result. Selfe v. United States,778 F.2d 769, 773 (11th Cir. 1985). In an appropriate case, however, either respondent or petitioner can argue that substance should take precedence over form. Glacier State Electric Supply Co. v. Commissioner,80 T.C. 1047, 1053 (1983). However, in this case, neither petitioner nor respondent has suggested that we should ignore the separate corporate *495 existence of Enterprises although we seriously doubt that Enterprises "became operative in any meaningful sense." See and compare Roubik v. Commissioner,53 T.C. 365, 382, (1969), with Haag v. Commissioner,88 T.C. 604 (1987). We accept Enterprises as a valid corporate taxpayer for its 2 years of existence. We are forced to the conclusion, however, that any business activity beyond the medical practice was ultra vires and therefore should be treated as a business activity of Mr. Slawek.
Understatements of Income -- 1971, 1973, 1974
We are convinced in this case that there were no intentional understatements of income by petitioners in any of the years before the Court. There is no evidence of any unrecorded and unreported sources of income other than the implications of respondent's determinations which are so flawed that they are entitled to no weight. As we said in Cox v. Commissioner,T.C. Memo. 1985-324: The totality of the evidence indicates that respondent's net worth computation contains a sufficient number of errors and items whose inclusion is highly questionable that respondent cannot be deemed to have established a prima facie net worth case. He has not established petitioners' *496 opening net worth with reasonable certainty. Respondent's failure to prove the accuracy of its net worth computation renders the computation incapable of sustaining the deficiencies circumstantially derived therefrom. See Holland v. United States,348 U.S. 121, 129 (1954). * * * [50 T.C.M. 317, 323 (1985); 54 P-H Memo T.C. par. 85,324.] We conclude that Dr. and Mrs. Slawek were during this period and prior thereto living largely on borrowed money. Especially during the years 1973 and 1974 when the shifted funds from one account to another in order to stave off bankruptcy which ultimately came. Any omissions from reported income were probably negligible and will be more than offset by back of substantiation of deductions to which the several petitioners may have been entitled.
Redetermination of Tax Liabilities
We have in this record evidence of approximately 1,000 transactions, in the form of canceled checks largely summarized on schedules and in one instance work papers prepared by one of respondent's agents at the direction of the Court listing and summarizing disbursements in the various years and by the various petitioners, a small number of which have been agreed to by respondent, *497 with the vast majority unagreed. It would be an inefficient and impracticable use of the time of this Court if we were to analyze each unagreed disbursement in terms of the evidence in this record in order to determine whether or not the disbursement is either self-proving or has been substantiated and then to determine whether or not the expenditure results in a deduction for Enterprises or for petitioners Slawek, or in some instances both. On this record, we have no choice but to take a practical approach and to attempt to arrive at as close an approximation as possible of gross income and deductions and credits of the several petitioners for the several tax years. This is an audit task. The parties will undertake the recomputation of the income tax liability of petitioners. In general the starting point will be the gross income reported on the several income tax returns, which except for the adjustments herein directed, will be accepted as correct. For reasons which are obvious, the taxable income of Enterprises must be determined first. We will enter an appropriate order directing petitioners and respondent to redetermine the taxable income for the several years as necessary *498 in light of the Findings of Fact and Opinion herein. With respect to Enterprises, its disbursements fall into several categories. Dr. and Mrs. Slawek together have satisfactorily identified a number of disbursements which should be categorized as part of the cost of goods sold to Enterprises for one or the other of its 2 fiscal years. For example, on transcript page 577, Dr. Slawek identifies malpractice premiums in the amount of $ 1,687 and $ 1,788, respectively, for the 1973 and 1974 fiscal years of Enterprises. Unless such sums can be shown by respondents from evidence in this record to have been allowed already to Enterprises, such additional deduction will be taken into account. There is a second category of expenditures -- those made by Enterprises for the benefit of Dr. or Mrs. Slawek individually, or for one of their business enterprises such as the Yacht Club. These expenditures will be treated as additional compensation to Dr. Slawek and a deduction to Enterprises. The expenditures will retain their identity and character in the hands of the individual petitioners and thus may be deductible for petitioners Slawek to the extent properly constituting a business expense, *499 as for example incurred in the operation of the Yacht Club, of course taking into account the personal use thereof by the Slaweks to the extent of 30 percent, as we have already found. As a further example, all utility expenses, repair expenses, and taxes so paid by Enterprises which have been substantiated will be so treated. Expenditures within the scope of section 274 and the regulations thereunder will not, however, be treated as deductible since there is in this record no substantiation of any item which meets the requirements of respondent's regulations for travel and entertainment. There is also another category of expenditures by Enterprises such as loan repayments which to the extend paid on loans made or assumed by Enterprises are not deductible by it nor taxable to Dr. Slawek. On the other hand repayments on loans made to Dr. Slawek should be treated as additional compensation to him. We recognize that there is confusion in this record as to the entity to which or to whom the loan was made, whether or not the loan was for business purposes, and whether if made to petitioner Slawek was actually assumed by Enterprises. We again conclude that the parties hereto are equally *500 at fault for the sad state of the record and for the loss of underlying documents and books. Also much time would be consumed in further efforts at clarifying the record, especially since we are convinced that the parties would be unable to reach an agreement on factual issues except at our direction. Accordingly, we deem such errors to be substantially immaterial and offsetting in this record. All loan repayments will be treated as transactions of Enterprises which are nondeductible, except to the extent that payments on loans on the Roxborough building can be identified from evidence presently in this record. The annual aggregate of such payments, if any can be identified, constitutes rent, deductible as such by Enterprises and includable in income by petitioners Slawek. There may be disbursements identified in this record as made for travel by Dr. Slawek in one or more of several capacities. Travel to medical conventions or otherwise on business related to the practice of medicine, although not substantiated as required by section274 and thus not deductible by Enterprises, does not constitute compensation taxable to Dr. Slawek or constructive dividends. On the other hand, *501 travel expense in connection with the Chicago lawsuit matter would be compensation to Dr. Slawek, though not deductible by him. To the extent that expenditures are on this record identified as Dr. Slawek's travel but not allocated to one of these two purposes, they will be arbitrarily allocated one-half to each. There may be some expenditures which are adequately explained on the record but their business justification is at best doubtful. For example Enterprises paid $ 225 for shirts made extra long so that allegedly Dr. Slawek could wear them at the office. [See transcript p. 800.] Personal use of the shirts must be assumed; this item would constitute additional compensation and would not be deductible by Dr. Slawek. We also note that there is documentation of salary or wages paid to Dr. Slawek and to Mrs. Slawek. These expenditures may or may not have already been deducted by Enterprises and taken into income by the Slaweks. Care must be taken to avoid double inclusion although doubt in such areas will be resolved in favor of respondent. There are expenditures by Enterprises to Cardiomobile Corporation some of which are substantiated as payments for patient services. If *502 not so explained such items will be treated as compensation to Dr. Slawek and as capital contributions by him to that corporation. We find that inadvertently petitioners Slawek included in their 1974 calendar year return 12 months gross income, one-half of which was included in the fiscal year 1974 income of Enterprises. It is unlikely that the reported income of Enterprises for fiscal 1974 can be separated between that pertaining to the calendar year 1973 and the calendar year 1974. Therefore, weighing heavily against petitioners as we are directed to do so by Cohan, the 1974 gross income of petitioners Slawek will be reduced by the lesser of one-half of their 1974 reported income or one-half of the fiscal year 1974 gross income of Enterprises. Finally, in carrying out our directions, both parties are cautioned that no new evidence of any kind of character will be received, presented, or utilized by either part in making these determinations. Any efforts by either party to do so will be treated as an intentional violation of orders of this Court, subject to appropriate sanctions. Respondent's attorneys and agents will accept as established facts whatever explanation of any disbursement *503 Dr. Slawek or Mrs. Slawek has made in the transcript. Petitioners are reminded, however, that in those many instances where Dr. Slawek in his testimony failed to recollect the purpose or nature of a disbursement, that expenditure will be treated as unsubstantiated. There may, however, be instances where there is no testimony with respect to a specific expenditure although the nature and purpose of the expenditure is quite apparent on the face of the canceled check. For example, New Jersey Bell Telephone expenditures are all related to the Yacht Club and will be so treated. In the case of some utilities, there may be confusion as to whether the expense pertained to the Slawek's residence or to the Roxborough office. In those instances, the utility expense will be treated as having been incurred for the residence and it will be allocated to business and personal use in accordance with our treatment of the "Office in the Home." That does not mean, however, that where there is specific testimony that a particular utility bill was incurred for or at a specific location, that testimony is to be ignored. Petitioners are entitled to the deductions and credits claimed on their returns *504 to the extent allowed by respondent in the statutory notices together with additional deductions and credits specified in the stipulations and finally that portion of the unagreed deductions and credits described in the stipulations and in the documentary evidence which is substantiated as outlined herein. When the reconstruction of income has been completed, the results will be stipulated, the stipulation filed as evidence in this case, and computations thereupon made under Rule 155. An appropriate order will be entered.
Footnotes
1. All sections references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. For the year 1970, respondent has stipulated that Dr. and Mrs. Slawek did not underreport their gross income. Respondent has also conceded the fraud addition for the year 1970.↩
3. Throughout the preparation for and trial of this case respondent's attorneys appeared to be certain that Dr. Slawek was guilty of fraudulently understating his income and overstating his deductions and that neither he nor Mrs. Slawek were capable of telling the truth, whether or not under oath. Perhaps in response thereto Dr. Slawek has been aggressive, combative, and largely uncooperative except in response to orders from the Court. These attitudes have greatly prolonged the trial, contributed to a record of over 1,200 pages of confused testimony, and a multitude of exhibits, and have made the task of the Court nearly impossible. 4. We recognize that if we were to sustain respondent's fraud addition, which we do not, the years would be open anyway. ↩
5. Dr. Slawek testified that the Monaloa was traded in on the Dottie Marie, but both boats were advertised for charter after the Dottie Marie had been purchased. ↩
6. We have excluded from these sums all expenditures which are subject to the substantiation requirements of sec. 274(d), since those strict substantiation requirements are not met on this record. We have also excluded all expenditures, the nature of which cannot be determined from this record. Some boating expenses were apparently incurred in later years during which time Dr. Slawek apparently owned another boat. However, the evidence is insufficient for us to make any determination as to the possible existence of a later boat-chartering activity. ↩
7. This item is composed of the following: $ 172.00 for two batteries (item 38 of Exh. II-51), and a pump and carpeting (Exh. 16). ↩
8. An "activity not engaged in for profit" is "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Sec. 183(c). ↩
9. Bank account records were made available to the accountants and were used in preparation of the income tax returns. Thus, this charter income was reported for tax purposes. ↩
10. Cohan v. Commissioner,39 F.2d 540↩ (2d Cir. 1930).
11. This organization had a separate bank account in the name of Ventnor City Marina and Yacht Club. ↩
12. Funds from these participants went through one or more of petitioners' bank accounts and should be excluded from all calculations of income and deductions. ↩
13. See discussion of applicable law under the heading "Charter Boat Venture."↩
14. Cohan v. Commissioner, supra.↩
15. See for example First Supplemental Stipulation and Joint Ex. S-34 described therein as well as Ex. 16. ↩
16. Certain expenditures were apparently made by Enterprises although there is no evidence that the Yacht Club was ever operated by anyone other than Dr. and Mrs. Slawek personally. Actual operation by Enterprises, which was a professional association, would be contrary to Pennsylvania law. 15 Pa. Cons. Stat. Ann. sec. 12601 et seq. (Purdon 1987). Expenditures by Enterprises for the Yacht Club will be treated as additional salary to Dr. Slawek, deductible to the extent substantiated. See discussion under the heading "Enterprises," infra.
17. Cohan v. Commissioner,39 F.2d 540↩ (2d Cir. 1930).
18. No food or similar expense for the dog has been claimed. Neither has Dr. Slawek claimed any deduction with respect to the dog for the period July 1-December 31, 1974.↩
19. We are prohibited by section 274 from using Cohan v. Commissioner, supra.↩
20. Cohan v. Commissioner, supra.↩
21. See Statement of Issues filed by petitioners on July 2, 1985, which makes no mention of this issue.↩
22. It should be understood that some of the material is independently proven in this record.↩
23. Under the laws of the State of Pennsylvania a professional association cannot engage in activities unrelated to the particular profession. See n. 16, supra.↩