EMMETT L. TETZ AND D. LAURIE TETZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tetz v. Commissioner
Docket No. 458-88
United States Tax Court
T.C. Memo 1990-26; 1990 Tax Ct. Memo LEXIS 26; 58 T.C.M. (CCH) 1211; T.C.M. (RIA) 90026; January 16, 1990
Robert S. Wrinkle, for the petitioners. [1]
*28 Thomas M. Rohall, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: For petitioners' 1984 taxable year, respondent determined a $ 23,690 deficiency in Federal income tax and additions to tax of $ 3,682.77 and $ 5,922.50 under sections 6651(a)(1) [2] and 6661, respectively. After concessions [3] of the parties, the issues remaining for our consideration are: (1) Whether petitioners' yacht chartering activity was an activity not engaged in for profit and (2) whether petitioners are liable for an addition to tax under section 6661. FINDINGS OF FACT The parties have entered into a stipulation of facts, along with attached exhibits, all of which were received in evidence and are incorporated by this reference. Petitioners, who at all pertinent times were husband and wife, resided in Deer Park, California, at the time their petition was *29 filed. Petitioners filed their 1984 joint Federal income tax return on February 5, 1986. No extension of time for filing petitioners' 1984 Federal income tax return had been requested or granted. Petitioner-husband is a medical doctor and petitioner-wife is a registered nurse. Petitioner-husband and petitioner-wife work about 80 and 55-hour workweeks, respectively. For the taxable years 1983 through 1987 petitioners earned and reported income from wages totaling $ 187,500, $ 196,076, $ 291,723, $ 364,500, and $ 244,176, respectively. During this period, petitioners reported and paid only $ 14,536 in tax. Petitioner-husband works about one and one-half hours away from the San Francisco Bay Area. Petitioners' interest in yacht chartering was sparked by another doctor who had 6 months' experience in yacht chartering at the time in question. Petitioners also discussed yacht chartering with two other doctors who had some experience in yacht chartering. Prior to their involvement with the yacht in issue, petitioner-husband had limited sailing experience with a smaller and different type of boat and petitioner-wife had no sailing experience. Petitioners, on December 3, 1983, purchased *30 a new 1983 42-foot Pearson Model 422 yacht (yacht) from Nor Cal Yachts, Inc. (Nor Cal), for $ 213,747. The title was placed in petitioner-wife's name. A $ 48,747 downpayment was made and the $ 165,000 balance financed over a 15-year period. The balance was to be paid in 180 payments of $ 2,086.59. At the time of purchase, Nor Cal provided petitioners with investment materials, including 5-year projections for income, expenses, and cash-flow. Based upon $ 21,000 annual charter income and assuming a $ 25,858.22 mortgage payment, an annual taxable loss approximating $ 60,000 was projected for 1984 through 1987. However, after considering tax benefits and eliminating about $ 40,000 of depreciation from the computation, a cash-flow ranging from about $ 5,300 to about $ 7,200 was also projected. The promotional materials contained the recommendation that the yachts be held for 5 years and then sold or traded-in. Petitioners, at the time of the acquisition, intended to sell the yacht after 5 years. Prior to purchase, petitioners also observed two other yacht leasing operations, but they did not verify or investigate the projections in the promotional materials or the statements made *31 by Nor Cal sales representatives. Petitioners "investigated" the "tax implications" of the yacht sale and leaseback arrangement with Nor Cal by reviewing the materials provided by Nor Cal. Petitioners, prior to purchase of their yacht, were advised that sailboats had appreciated in value over the prior 5 years. As part of the Nor Cal promotional material, petitioners were given a Wall Street Journal article reflecting that yachts had been appreciating about 10 percent per year for the past few years. The article, which was stipulated to by the parties, does not bear a date, but there is reference in the article to the year 1981 in the present tense. On or about the time of the purchase, petitioner-wife signed an Addendum to Sales Contract, which, in pertinent part, contained the following statement: Purchaser has reviewed the subject matter herein set forth and understands that there is no representation guaranteeing that the subject property will produce any operational income except as stated in the yacht lease agreement or any aspect concerning the business conducted by Sailboats, Inc. dba Nor Cal Yachts or Club Nautique at Mariner Square, Alameda, CA. Purchaser must rely *32 solely on his or her own business judgment with respect to the lease of subject property to Club Nautique and further that there can be no assurance that the Internal Revenue Service will not be ultimately successful if it challenged the investment credit or the deduct[i]bility of items connected with the subject matter of this contract. The purchaser should and must depend upon the advice of his tax advisors, tax counsel, or accountants with respect to his investment in the subject matter of this contract * * *. Nor Cal was connected with a charter operation named Club Nautique. Petitioners were advised that Nor Cal/Club Nautique wanted a larger boat in their fleet and they advised that a larger boat would produce higher income than the $ 21,000 projected. Petitioners enrolled [4] the yacht in the chartering operation of Club Nautique, which was a membership organization and chartered boats to members and others. Club Nautique was located in the San Francisco Bay area. Petitioners made no personal use of the yacht. Overall, 85 to 90 percent of charters were to members of Club Nautique. With respect to larger boats (which would include 42-foot boats) there may have been a larger *33 number of nonmember charters, because individuals from out-of-town who are not capable of sailing a boat may hire a skipper and charter a larger boat. Petitioners did not do any advertising with respect to the their yacht charter activity. The vast majority of boats in the charter clubs of which petitioners were members were in the 20 to mid-30-foot range. Relatively few sailors are qualified to charter a 42-foot yacht. In 1985 petitioners switched from Club Nautique to Dave Garrett Sailing, another membership and charter club. Club Nautique tended to cater to the "yachting elite" and Dave Garrett tended to cater to entry level sailors. No yacht in Dave Garrett's charter fleet has ever earned as much as $ 21,000 in gross income. In 1987 the boat was again moved to a Sausalito charter location. Charters were usually for one day. Very few charters occurred after October or before May. For 1983, petitioners reported $ 263 of gross receipts and $ 32,409 of deductions (including $ 32,062 of depreciation) resulting in a claimed loss of $ 32,146 from the *34 yacht charter activity. For 1983, petitioners also claimed $ 21,375 as investment tax credit attributable to the yacht. For petitioners' 1984 taxable year they reported $ 13,405.50 of gross receipts and $ 66,703.32 of deductions (including $ 49,161.81 of depreciation) resulting in a claimed loss of $ 53,297.82. The remainder of the $ 66,703.32 in deductions claimed for 1984 consisted of $ 14,039.08 of interest expense, $ 2,681.10 of commissions, and $ 821.33 categorized by the parties as "other." The yacht was out of service for a few months during 1984 for repairs. During the Internal Revenue Service's administrative consideration of petitioners' 1984 taxable year, petitioners claimed an additional $ 7,707 of deductions which had not been claimed in petitioners' 1984 Federal income tax return. The additional $ 7,707 amount consists of $ 1,933 for slip rental, $ 124 for sales taxes, $ 5,448 for insurance, and $ 202 categorized by the parties as "other." Petitioners reported gross receipts and deductions for depreciation, interest, other expenses, and losses for 1985, 1986, and 1987, as follows: Gross Deductions
Year
Receipts
Depreciation
Interest
Other
Losses
1985
$ 11,186
[5] $ 44,887
$ 14,039
$ 2,908
$ 50,648
1986
6,217
44,887
14,039
5,884
58,593
1987
4,670
44,887
14,039
[6] 9,625
63,881
*35 During 1984, the rental schedule for a Pearson 422 yacht was, as follows: Rental Period
Cost *
Regular Weekday (Monday - Friday, 8:00 a.m. to sunset)
$   300
Saturday, Sunday and Holidays
405
Weekend (Friday, 5:00 p.m., to Sunday, sunset)
710
Mini Cruise (Monday, noon, to Friday, sunset)
995
Maxi Cruise (Friday, noon, to second Sunday, noon)
1,395
*36 During 1984, petitioners maintained one checking account for all their activities, both personal and business. Although they recorded matters concerning the yacht activity in a book and kept monthly statements from the charter club in a folder, a separate set of books was not maintained for the yacht activity. Petitioners inspected the yacht at least five times during 1984. The useful life of petitioner's yacht was 20 years and it had a value of about $ 140,000 to $ 150,000 during November 1988. Respondent's agent, Virgil Nelson, prepared an analysis of the projections provided to petitioners by NorCal. Agent Nelson's analysis reflects that, given the most favorable assumptions proposed by Nor Cal, the yacht charter would have negative cash-flow for the first 15 years and only the existence of tax benefits would permit the recoupment of petitioners' cash investment. Agent Nelson's analysis further reflects that after 5 years the maximum tax benefits would have been achieved and that the potential for negative cash-flow, even after considering tax benefits, would begin. At the end of 20 years, if Nor Cal's projections were extended, the total negative cash-flow would have *37 been $ 367,503 and the total tax benefits would have been $ 168,987. Accordingly, if the yacht was worth less than approximately $ 200,000 at the end of 20 years, the potential for loss would have been greater. If, however, petitioners sell the boat after 5 years, the projected tax benefits exceed the projected negative cash-flow by approximately $ 7,000. In addition to the yacht activity, petitioners reported the following amounts (rounded to the nearest dollar) of income or (loss) from the described activities for the taxable years 1983 through 1986: Source
1983
1984
1985
1986
Oil & Gas
$     921 $      14 $      -  $      -  Rentals
(4,477)
(7,074)
(6,219)
(12,992)
"Sr. Residence"
(36,901)
(64,598)
(81,183)
(91,329)
"Jan"
(18,510)
(4,721)
(1,544)
(751)
"Newsworthy"
(13,134)
(2,196)
(1,426)
(693)
"BD Twelve"
-  (3,528)
(2,768)
(203)
Medical Blgd.
1,003 501 401 1,280 "Corona"
7 37 145 459 Farming
(363)
9,637 9,636 -  Civic Center
-  -  951 1,164 Commodity
-  -  -  37 Interest & Div.
6,896 2,361 3,137 333 Cap. Gain & Loss
(3,000)
(1,924)
-  (3,000)
*38 OPINION We must consider whether the petitioners' yacht chartering was an activity not engaged in for profit. Petitioners bear the burden of proving that they are entitled to the deductions concerning their yachting activity. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Section 183 disallows certain deductions attributable to an activity not engaged in for profit. [7] An "activity not engaged in for profit" is defined by section 183(c) as any activity other than one for which deductions are allowable under section 162 (relating to trade or business expenses) or section 212(1) or 212(2) (relating to expenses for the production or collection of income, or for the management, conservation or maintenance of property held for the production of income). If an activity is not engaged in for profit, under section 183(b)(1) only those deductions which are not dependant upon a profit objective would be allowable. Under section 183(b)(2) other deductions are allowable, but only to the extent of any gross income generated from the activity. *39 Whether petitioners' yachting activity constitutes a trade or business or relates to expenses for production of income depends on whether the taxpayer had the requisite profit objective. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). A taxpayer need not prove that he had a reasonable expectation of profit in order to establish that he engaged in the activity for profit; he must show, however, that he entered into or continued the activity with the actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner, 72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). In determining the taxpayer's objective, greater weight is given to objective facts than to the taxpayer's mere statement of intent. *40 Sec. 1.183-2(a), Income Tax Regs.
Petitioners argue that Carter v. Commissioner, 645 F.2d 784 (9th Cir. 1981), affg. a Memorandum Opinion of this Court, establishes a different standard from an "actual and honest objective of making a profit." In Carter, the Court of Appeals for the Ninth Circuit stated that section 183 must be read in conjunction with section 162 and that section 162 "applies when a taxpayer's basic or dominant motive is to realize a profit or taxable income from the activity." 645 F.2d at 786. Petitioners seize upon this language and request that we find significance in the Court's use of the word "motive" in connection with profit. They argue that such language creates a standard which places greater emphasis or focus upon a taxpayer's state of mind, as opposed to the reasonableness of his thoughts or actions. Petitioners argue further that this standard is different from that used in opinions wherein the word objective is used in connection with profit. The distinction argued by petitioners is more a matter of semantics than substance. The Ninth Circuit used the "motive language" to describe *41 the application of section 162. While the Circuit Court did not discuss the section 183 standard as established by the case law of this and other courts, we note that it referenced the nine factors set forth in the section 183 regulations and it used these factors in discussing whether the taxpayer's activities had the manifestations of a business. 645 F.2d at 786. Thus, regardless of whether one argues that the standard involves either "motive" or "objective," the taxpayer's intent must be measured by means of objective factors. We must determine whether petitioners' statement and testimony that they intended to make a profit is credible when viewed in light of the facts in this record. We shall use the factors set forth in the section 183 Income Tax Regulations to assist in evaluating petitioners' stated objective. All facts and circumstances that bear on the activity are to be taken into account in determining whether it was engaged in for profit. Sec. 1.183-2(b), Income Tax Regs. Included in the regulation are nine factors as among those *42 that should normally be considered: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. No single factor is controlling. Golanty v. Commissioner, supra at 426; Dunn v. Commissioner, 70 T.C. at 720. The general circumstances here are similar to numerous cases involving taxpayers who claim deductions in excess of their income from a particular activity. Petitioners had little, if any, knowledge and no expertise concerning the yacht chartering business. Based, in great part, upon information set forth in promotional materials, petitioners purchased an asset and followed the pro forma example provided *43 by the seller of the asset or promoter of the "investment." See, e.g., Antonides v. Commissioner, 91 T.C. 686, 695 (1988) (which involved a strikingly similar yacht chartering venture), wherein we stated: "The facts which petitioners rely on in support of their position are based almost entirely on their own self-serving testimony." Here too, the objective facts surrounding petitioners' purchase of the yacht do not support, and in some instances contradict, petitioners' statement that they intended to make a profit. The parties have presented their arguments on brief by tracking the nine factors outlined in the regulations and we adopt their format in this opinion. 1. The manner in which taxpayers carried on the activity. Petitioners did not personally carry on any yacht chartering activity. Essentially, they relied upon the representations and expertise of their seller and the lessee recommended by the seller. Through Nor Cal their yacht was placed with a yachting membership club. The majority of the leases or charters were with club members. Petitioners are both professionals with average workweeks exceeding 50 hours, and they had little time to *44 devote to the chartering activity. Petitioners visited and/or inspected the yacht at least five times during 1984, but this fact is of little significance considering petitioners' self-proclaimed lack of expertise and experience with yachts or yacht chartering. The parties have argued about the formality or completeness of petitioners' books and records as an indicator of petitioners' objective. We do not place much probative weight on this factor. This particular transaction is a sale and leaseback and the lessee was operationally responsible for the daily detail and reporting to petitioners. However, we note that a person who was concerned about his or her charter activity would likely keep adequate books or require the lessee to provide adequate reports to evaluate charter business financial and operational activity. Petitioners argue that their change of charter lessees during 1985 and 1987 indicates the abandonment of unprofitable method within the meaning of section 1.183-2(b)(1), Income Tax Regs. Considering that the amount of charter income steadily decreased during the period from 1983 through 1987, without a corresponding decrease in operational *45 expense or depreciation, this factor tends to suggest and, to some extent, confirm that petitioners' yacht activity was not viable, regardless of the location. If petitioners, early on, had truly abandoned the yachting activity because of the lack of profit potential, that would have been a probative factor in support of the argument that abandonment was a business-like approach. Here, however, they merely changed their charter lessee. It is obvious why petitioner continued the charter activity in spite of the lack of income. The tax benefits justified the cash outlay. 2. The expertise of the taxpayers or their advisors. Petitioners label this area as "Investigation" and we find their label appropriate. With a self-avowed lack of expertise in yacht and yacht leasing matters, petitioners' investigation prior to purchase takes on special significance as a factor in reflecting their objective. Petitioners were introduced to the yacht chartering idea by another doctor with limited experience. Two other doctors were consulted whom petitioners have not shown were knowledgeable about boats or the charter business. Petitioners also visited other charter operations and interviewed *46 them. As with the charter operation from whom petitioners bought the yacht, the other operators were not hired by petitioners to provide an independent and expert opinion. Petitioners' seller, as well as the other charter operators, must be assumed to have a strong motivation to sell yachts, an activity from which they seek their profit. Considering petitioners' lack of expertise, there was no way for them to effectively evaluate the claims of any of the sellers and yacht charter operators, all of whom stood to gain by persuading petitioners to purchase and lease back a yacht. In this same vein, one may assume that the sale of bigger yachts produced bigger profits for the seller. Even without expertise in yachts and chartering, petitioners could have observed that Nor Cal's projections, even assuming $ 21,000 of annual income, resulted in negative cash-flow. Further, the recommendation that the "income-producing asset" should be sold after the 5th year before it can generate positive cash-flow and when its useful life is 20 or more years, is suspect and raises doubts about the economic substance of this transaction when considered separate and apart from the tax benefits. Although *47 petitioners were unable to prove that yachts of the type they purchased were appreciating at the rate of 10 percent per year, petitioners stated that they relied upon what appears to be a 1981 Wall Street Journal article indicating that for the past few years (probably pre-1981 years) yachts had appreciated about 10 percent per year. [8] On this premise, petitioners offered a "net income forecast" (Exhibit 18) which reflected that the yacht would be worth $ 320,622 in the 5th year and $ 641,247 in the 20th year, assuming a 10-percent increase in value per year. We note that petitioners' projected 10-percent increase has been compounded. Petitioners did not prove this premise and we find it hard to believe that any investor would assume or believe that an asset would increase 10 percent compounded per year for its entire useful life, even though it is a "wasting asset." Petitioners must have recognized that at some point the yacht is likely to drop to its scrap value. Here petitioners, to project profitability, expect us to believe that this yacht would mysteriously continue to appreciate in value. This premise is also a paradox because of petitioners' express intention to sell the *48 boat after 5 years. The reality of the situation is that petitioners' yacht was worth $ 140,000 to $ 150,000 at the time of trial (November 1988), which was the 5th year after the 1983 purchase. Rather than a 10-percent simple or compound increase, the actual value 5 years out reflects a 6 to 7-percent average annual decrease in value, based upon its $ 213,747 purchase price. Considering that petitioners "invested" over $ 200,000 in this venture, they did little other than consult with a few other doctors or others whose interest would be in conflict with petitioners'. If petitioner had evaluated the simple economics, the unrealistic and exaggerated nature of this transaction would have been apparent, with or without considering the tax benefits. 3. The time and effort expended by the taxpayer in carrying on the activity. As noted above, in a sale and leaseback situation the amount of time devoted is not as significant as the quality *49 of attention given to the activity. Petitioners, because of their work schedules of over 50 hours per week, had little time to devote. The type of activity at issue here would not necessarily require petitioners' everyday involvement to be successful. Accordingly, we must look more to the intent of petitioners and measure the intent by other factors. 4. The expectation that assets used in the activity may appreciate in value. The promotional materials provided to petitioners by Nor Cal focus on earning capacity and tax benefits. Although petitioners provided a Wall Street Journal article, they otherwise offered only hearsay and self-serving statements about representations that the yacht would increase in value. As discussed in factor 2, the amount of appreciation necessary to cause a profit in spite of the lack of cash-flow and the relatively large claimed tax losses would have been beyond the realm of possibility. More importantly, petitioners have not shown appreciation to be the factor that induced their involvement. The focus of Nor Cal's promotional materials is the opportunity to obtain about $ 20,000 in investment tax credit in the year of purchase and $ *50 132,677.85 in tax benefits essentially from large depreciation deductions over the first 5 years, all of which was based on a $ 29,600 cash down payment. Petitioners did not show whether the alleged potential for appreciation was equal for both large and small boats. We have difficulty accepting petitioners' position that all of the projected tax benefits were based on relatively nominal cash outlay and were available. We also question their expectation that the asset would double in value about one-half of the way through its projected useful life. Petitioners' investment activity during this period was extensive and diverse, and ostensibly they had acquired some investment evaluation acumen regarding the general economic substance of business transactions. They are not, under these circumstances, entitled to hide behind alleged naivete in business matters. 5. The success of the taxpayer in carrying on other similar and dissimilar activities. Petitioners earned professional income from their services ranging from $ 187,500 to $ 364,500 during the taxable years 1983 through 1987. During those same years they were active investors in various activities, including *51 oil and gas, real estate rental, farming, partnership ventures, stocks, and interest producing assets. Some of petitioners' investments produced income and some produced losses. Analysis of the income and loss pattern reflects that certain of the investments generally generated profit from the beginning and others generally generated losses from the beginning. The total amount of losses was far greater than the gains and appears to provide tax shelter to petitioners' relatively large income from wages. Additionally, there is a pattern to the losses. Some of the losses appear to be from accelerated depreciation because the amounts claimed reduce precipitously over a relatively short period of years. The amount of reduction in depreciation in most of the losses appears to be in pre-calculated arithmetic digressions. The pattern of petitioners' investments indicates that petitioners were motivated to seek tax losses to reduce their tax burden from their wages. During the 5-year period 1983 through 1987, petitioners reported and paid only $ 14,536 in tax, while earning income exceeding $ 1,200,000. 6. The taxpayer's history of income or loss with respect to the activity *52 . Petitioners experienced losses for each of the years that the yacht was in service. Although petitioners moved the yacht to different charter operations in years subsequent to the taxable year, the gross receipts from the activity were highest at the initial charter location, which was affiliated with Nor Cal and presumably the basis for the projected $ 21,000 in annual gross receipts from chartering. In only 2 years did the gross receipts exceed $ 10,000 and the best year was 1984 with $ 13,405.50 of gross receipts. 7. The amount of occasional profit, if any, which is earned. Petitioners earned no profit from the yachting activity. 8. The financial status of the taxpayer. Section 1.183-2(b)(8), Income Tax Regs., includes the statement that substantial earnings from sources other than the activity, especially where the activity generates substantial tax benefits, may be an indicator of the lack of a profit objective. As discussed above, petitioners fit that pattern, both with respect to their yacht activity and the numerous other apparent *53 tax sheltering activities which were reported on their Federal income tax returns. 9. Whether elements of personal pleasure or recreation are involved. Although yachting clearly provides the potential for personal pleasure or recreation, petitioners did not purchase or use the yacht for personal pleasure or recreation. In the final analysis, we do not believe that profit was either the objective of petitioners in purchasing the yacht. Considering their intent to hold the yacht only 5 years and even assuming that Nor Cal's projections and petitioners' annual 10-percent appreciation projection, the chartering activity would still not have provided a cash-flow during the first 5 years and for some period thereafter. See Antonides v. Commissioner, 91 T.C. 686, 696 (1988). Although petitioners would have liked to make a profit from operations or appreciation, their objective was to utilize the tax benefits to shelter their income from wages. Petitioners are thus limited to those deductions which are allowable regardless of whether the chartering activity was engaged in for profit and other deductions, to the extent that they do not exceed the income *54 from the yachting activity under section 183(b)(1) and 183(b)(2). There remains for our consideration the issue of whether petitioners are liable for an addition to tax under section 6661. Section 6661 provides a 25-percent addition to tax if there is a substantial understatement of income tax. An understatement is "substantial" if it exceeds the greater of 10 percent of the tax required to be shown for the taxable year or $ 5,000. An "understatement" does not include an amount attributable to "the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment * * *." Sec. 6661(b)(2)(B)(i). Additionally, an understatement does not include any item for which there was adequate disclosure. Sec. 6661(b)(2)(B)(ii). Petitioners do not argue that there was "adequate disclosure" in this case. Petitioners argue that there was substantial authority for the claimed loss from the yachting activity. Petitioners argue that there is "extensive case authority supporting the deduction of yacht chartering investments * * *." In Antonides v. Commissioner, supra at 702-704, *55 we evaluated a similar argument that another taxpayer made in connection with losses claimed from yacht chartering activity. The discussion in Antonides includes the standards to be considered and is incorporated herein. In Antonides we considered the following cases where losses from this type activity were allowed: Slawek v. Commissioner, T.C. Memo. 1987-438; Zwicky v. Commissioner, T.C. Memo. 1984-471; Dickson v. Commissioner, T.C. Memo. 1983-723; and McLarney v. Commissioner, T.C. Memo. 1982-461. Petitioners, in arguing this point on brief, did not reference the cases that constituted the "extensive case authority supporting" their deduction, but they did reference and compare the four above-cited Memorandum Opinions in other parts of their brief. In Antonides we also factually distinguished the above-cited Memorandum Opinions thereby finding that the authority was of little relevance within the meaning of section 1.6661-3(b)(3), Income Tax Regs. The four cases where taxpayers were successful are also factually distinguishable from the facts of this case. In *56 Slawek v. Commissioner, T.C. Memo. 1987-438, the taxpayer had experience in the use and operation of motorboats and several different boats had been purchased at different times. Additionally, the taxpayer in that case personally advertised for charters in The Wall Street Journal and when the charter of the boats was unprofitable, the boats were sold (at a loss) after an unprofitable season or two. Petitioners here were without specialized knowledge and did not personally attempt to operate the charter activity. Instead, here the focus is upon the projections made by Nor Cal, and petitioners accepted them without seeking independent expertise to verify the potential for profit, either from revenue or appreciation. We think it is abundantly clear that petitioners did not seek independent expertise because they were essentially indifferent about the projection, as long as the tax shelter benefits were available. Zwicky v. Commissioner, T.C. Memo. 1984-471, involved an avid sports fisherman who decided to utilize his boating and fishing expertise to make a profit. Before offering his boat and personal services for charter, he analyzed the *57 costs involved with his wife, who was a certified public accountant. Special licenses were obtained and the taxpayer advertised his charter boat and services in newspapers, fliers (which he distributed), business cards, telephone book listings, and word of mouth. Through the taxpayer's efforts the number of charters and the amount of income increased each year. Both Zwicky and Slawek involved personal expertise and efforts which are absent from the case under consideration. Dickson v. Commissioner, T.C. Memo. 1983-723, involved, in a similar manner to the prior two cases, an individual who acquired extensive boating and charter experience prior to involvement in charter activity. In that case the taxpayer performed a detailed study of the geographical area and charter activity in that area. He intended to establish the charter business and to continue it upon his retirement from an airline job. That taxpayer also developed and analyzed the financial prospects of his planned charter activity. As in the prior two cases, Mr. Dickson personally advertised his charter activity. Another key difference is that Mr. Dickson depreciated the yacht on a straight *58 line basis. Initially he used a 10-year depreciable basis but later extended the depreciable life to 15 years, thereby decreasing the amount of his deductions. In addition to personal expertise, extensive preparation and efforts, Dickson is materially different from the present case because of Mr. Dickson's objective to seek a profit and to establish a business, whereas petitioners in this case merely sought to utilize the maximum tax benefits and sell the yacht when the tax benefits dissipated. McLarney v. Commissioner, T.C. Memo. 1982-461, also concerns the personal involvement of a taxpayer in yachting activity. That taxpayer was seeking a profit-making activity and considered several types of investments until finally selecting charter yachting. After deciding on the charter investment, the taxpayer spent an extensive amount of time considering the marketplace, evaluating the financial aspects, and the type of boat to purchase. After considerable investigation and searching, Mr. McLarney purchased a 14-year-old used boat which had been properly maintained. Mr. McLarney personally cared for and regularly inspected the boat. After an unsuccessful exclusive *59 leasing arrangement with one charter company, the boat was placed, on a nonexclusive basis, with several companies. Also, Mr. McLarney personally advertised and gave demonstration rides to prospective charter customers. The depreciation claimed by Mr. McLarney represented from about one-fourth to one-half of his total expenses and did not exceed $ 2,371 during the years considered by the Court. Here, again, Mr. McLarney went about his investment and operation of the yacht activity in a manner which reflected his objective to seek a profit, whereas, comparatively, petitioners in this case did not. Although petitioners have argued that extensive case authority supporting their deductions existed, the cases that petitioners may have referenced are inapposite and clearly factually distinguishable, except that they involve yacht chartering. Additionally, Slawek v. Commissioner, supra, had not been decided until after petitioners claimed their 1984 deductions and the other cases had not been decided at the time petitioners purchased the yacht. More specifically stated, petitioners here performed a cursory investigation and did not have personal expertise, whereas *60 the cases cited reflect extensive analysis and/or expertise involving consideration of the potential for profit. Here petitioners sought maximum tax deductions, mostly from depreciation, and intended to abandon the activity when the maximum tax benefits stopped flowing. In summary, the case support for petitioners' claimed deductions does not constitute "substantial authority" because the cases that petitioners would ostensibly rely upon are factually distinguishable. Sec. 1.6661-3(b)(3), Income Tax Regs. Accordingly, the addition to tax under section 6661 is applicable in this case regarding the understatement attributable to petitioners' yacht activity. To reflect the foregoing and concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. Robert S. Wrinkle, Esquire, entered his appearance after the trial representing petitioners for purposes of briefing. Petitioner Emmett L. Tetz appeared pro se at the trial.↩
2. Section references are to the Internal Revenue Code, as amended and in effect for petitioners' 1984 taxable year. Rule references are to this Court's Rules of Practice and Procedure. ↩
3. Petitioners have conceded that they are liable for an addition to tax under section 6651(a)(1).↩
4. The parties did not present any evidence of an agreement or of the understanding between petitioners and Club Nautique.↩
5. It is of interest that the amount of depreciation claimed by petitioners for the first 5 years exceeds the purchase price of the yacht. Petitioners claimed $ 32,062 in 1983, $ 49,162 in 1984, and $ 44,887 for each of the years 1985 through 1987, for a total of $ 215,885. The total purchase price of the yacht was $ 213,747. ↩
6. Although the parties stipulated this item to be $ 7,519, that amount is not the amount reflected in Exhibit 7-G (petitioners' 1987 Federal income tax return) and it does not, in conjunction with other deductions and the income item, provide the correct mathematical basis for the amount of claimed loss. We have, for purposes of accuracy and convenience used $ 9,625 which was reflected in petitioners' 1987 return in place of the amount stipulated.↩
*. Discounts to these listed prices were allowed for club members and for certain times of the year. Prime yachting season in the area of petitioners' chartering activity was May through September or October.↩
7. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule. -- In the case of an activity engaged in by an individual * * *, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).↩
8. See Antonides v. Commissioner, 91 T.C. 686, 695-696↩ (1988), for discussion of what appears to be a reference to the same or a similar Wall Street Journal article. That discussion involved a 1982 taxable year.